THE STATE OF OHIO, APPELLEE, *v*. JONES, APPELLANT.

[Cite as *State v. Jones,* 135 Ohio St.3d 10, 2012-Ohio-5677.]

*Criminal law—Aggravated murder—Death penalty affirmed.*

[No. 2008-0525—Submitted July 10, 2012—Decided December 6, 2012.]

APPEAL from the Court of Common Pleas of Summit County,

No. CR07 04 1294.

_____

O'CONNOR, C.J.

{¶ 1} This is a death-penalty direct appeal as of right. A Summit County jury convicted appellant, Phillip L. Jones, of numerous crimes in connection with the murder and rape of Susan Yates and unanimously recommended that he be sentenced to death. The trial court accepted that recommendation and sentenced Jones accordingly.

{¶ 2} For the following reasons, we affirm Jones's convictions and sentence of death.

BACKGROUND

*Facts and Procedural History*

{¶ 3} Jones was charged with one count of aggravated murder, one count of murder, and two counts of rape.

{¶ 4} Count 1 charged Jones with the aggravated murder of Yates while committing rape. The count included a death-penalty specification for committing, attempting to commit, or fleeing immediately after committing or attempting to commit rape and that Jones was the principal offender in the commission of the aggravated murder, R.C. 2929.04(A)(7). Count 2 charged

Jones with the murder of Yates. Counts 3 and 4 charged Jones with rape.[1] All four counts included specifications charging Jones as a repeat violent offender.

{¶ 5} Jones pled not guilty, and the case proceeded to trial.

### The state's case-in-chief

### The criminal investigation

{¶ 6} At around 6:20 a.m. on April 23, 2007, Richard Wisneski was jogging his usual route on the paved path through Mount Peace Cemetery in Summit County when he discovered a woman's body. The body was lying face up on the ground next to the path and in front of some headstones. Wisneski ran out of the cemetery. After unsuccessfully attempting to flag down a motorist, Wisneski ran to a McDonald's restaurant and called 9-1-1.

{¶ 7} Police officers arrived at the cemetery shortly thereafter and quickly determined that the woman, later identified as Susan Marie Christian Yates, was dead. Yates was wearing a brown sundress under a denim skirt and vest, a denim jacket, and a bra. Her skirt was torn. So was her bra, which had been ripped at the connecting fabric between the cups and was turned around on her torso. Her shoes, a denim hat, and a pocketknife were on the ground near her body. Yates's face and neck had numerous bruises. A small, plastic, glow-in-the dark cross had been placed over her right eye.

{¶ 8} The police searched the scene and collected evidence, including two buttons that they found on the roadway, 27 and 44 feet from the body, that appeared to match buttons on Yates's dress. One of Yates's earrings was also recovered from the roadway.

---

1. The trial court instructed the jury that Count 3 referred to vaginal rape and Count 4 referred to anal rape.

**{¶ 9}** The police were not able to immediately identify Yates because she did not have any identification on her and none of the officers recognized her. Later that same day, Yates was identified through her fingerprints, but her name was not released to the media. The next day, April 24, an article in the Akron Beacon Journal newspaper reported that the body of an unnamed woman had been found in the cemetery.

**{¶ 10}** Around 4:00 p.m. that day, Jones was watching the news on television and reading the newspaper. Afterwards, he and his wife, Delores, had a conversation about the news. Shortly thereafter, the couple walked to a nearby store, and Jones bought some cigarettes. Upon returning home, Delores got in her car and drove to the home of her friend, Charletta Jeffries.

**{¶ 11}** Delores arrived at Jeffries's home between 4:30 p.m. and 5:00 p.m. Delores ran up Jeffries's stairs and screamed, "He did it, he did it." Jeffries asked, "He, who?" and Delores replied, "My husband, Phil." Jeffries then asked, "Did what?" and Delores responded, "Murdered the woman." Jeffries then asked, "What woman?" and Delores replied, "The woman that they found in the cemetery."

**{¶ 12}** Delores then called the police, told them that she had information about the woman found at the cemetery, and asked to speak to "somebody in charge."

**{¶ 13}** Shortly after the phone call, Detective Richard Morrison arrived at Jeffries's home. Delores was hyperventilating and acting "hysterical." Morrison asked Delores, "Do you have something you need to tell me?" Delores replied, "My husband is the one that killed that girl in the cemetery." Morrison then asked, "How do you know this?" and Delores said, "Because he told me her name was Susan. Isn't it Susan?"

**{¶ 14}** Delores also disclosed that she had arrived home on April 22 at around 10:30 p.m., and Jones was not there. Delores was unable to determine

Jones's whereabouts, and she spent the night with her mother. Between 7:00 and 8:00 the next morning, Delores returned home and found Jones asleep in bed. She noticed that Jones had a scratch on his shoulder and lip.

{¶ 15} During further questioning at the police department on April 24, Morrison showed Delores the cross found over Yates's eye. Delores said that she did not recognize it. Later that evening, police officers accompanied Delores to her home, where she collected clothing and her jewelry box before going to a domestic-violence shelter.

{¶ 16} On April 25, Delores notified police that she had found a glow-in-the-dark cross in her jewelry box and that it was similar to the cross found at the cemetery. Delores testified that Jones had given her the glow-in-the-dark cross in June 2006 and that she knew that Jones kept another glow-in-the-dark cross in his wallet.

{¶ 17} Based on the information learned from Delores's interview, the Akron Police Department issued a "be on the lookout" for Jones. Thereafter, the police secured an arrest warrant for Jones.

*The arrest*

{¶ 18} At around 11:00 p.m. on April 24, police spotted Jones driving near his home and arrested him. Jones was briefly interviewed at the police station that night and stated only, "[A]ll I'm going to say about this is that it was an accident."

{¶ 19} Investigators examined Jones's car and took swabbings from the interior of the vehicle. Subsequent testing found no evidence that the victim had ever been in the car.

*The autopsy*

{¶ 20} The chief deputy medical examiner for Summit County, George Sterbenz, M.D., conducted the autopsy on Yates. Dr. Sterbenz noted abrasions on the upper chest, collar bones, neck, and jaw line. Yates had bruising around her

4

right eye and scalp and smaller abrasions over her arms, legs, feet, and back. Dr. Sterbenz also noted that the "blows caused abrasions * * * all over the neck and jaw and over the collar bones and shoulders." There were "gouging" or "fingernail type abrasions" on her neck, right thumb, and elbow. Petechiae, or "pinpoint type hemorrhages," were found on her face and in her eyes. Yates's larynx was fractured in two places: the hyoid bone and the thyroid cartilage.

{¶ 21} Dr. Sterbenz concluded that Yates died from asphyxia by strangulation. He opined that Yates had been dead for 6 to 12 hours before her body was found.

{¶ 22} Dr. Sterbenz also concluded that Yates had been sexually assaulted. There were extensive vaginal injuries, including bruising of the fatty and muscular tissues that form the deep wall of the vagina. He opined that such injuries may have been caused by "a fist * * * or very large rigid foreign object." He also found a wadded Kleenex or toilet-type paper inside Yates's vagina.

{¶ 23} There was also a significant amount of internal, deep bruising to the anus and rectum. Dr. Sterbenz stated that a long and rigid object likely caused these injuries from the object's having been violently "placed into the anus" and "jammed up into the rectum." A twig was also found in the fecal material inside the rectum about four to six inches from the anal opening.

{¶ 24} A toxicology screen detected the presence of cocaine and alcohol. Yates's blood-serum level of alcohol was .096 percent.

*The forensic evidence*

{¶ 25} Evidence collected during the criminal investigation and the autopsy was sent for testing to the Ohio Bureau of Criminal Identification and Investigation ("BCI").

{¶ 26} Dale Laux, a forensic scientist at BCI in charge of examining samples to identify body fluids, found sperm on the vaginal swabs taken from Yates. He also detected sperm on stains found on the inside of Yates's skirt. No

seminal fluid was detected on the rectal swabs or on tissue paper found near the body.

{¶ 27} Laux forwarded the samples that tested positive for sperm to Stacy Violi, a DNA examiner at BCI, for DNA testing. Violi concluded, "Phillip Jones cannot be excluded as a source of semen on the vaginal swabs and cuttings from the skirt." Violi testified, "Based on the national database provided by the Federal Bureau of Investigation, the expected frequency of occurrence of the DNA profile identified in the sperm fraction of the vaginal swabs and the cuttings from the skirt * * * is one in three sextillion, thirteen quintillion unrelated individuals." In other words, Violi explained that she would have to test more than three sextillion individuals before finding the same DNA profile. The world's population is less than seven billion people.

{¶ 28} Violi also tested swabs obtained from the surface of Yates's breast. Violi concluded that "[t]he DNA profile from the breast swabs is a mixture of at least two individuals. The major DNA profile is from an unknown male. The minor DNA profile is consistent with contributions from Susan Yates." Violi also tested the cross, but did not find enough DNA to make a comparison.

*Other acts evidence*

{¶ 29} In 1990, Jones had pled guilty to two counts of attempted rape. He was sentenced to an indefinite prison term of four to 15 years. Jones served 14 years and two months in prison before being released in July 2004.

{¶ 30} A victim, T.J., who had been 16 years old at the time of the assault, testified at Jones's capital trial about the 1990 assault. She recalled that on the evening of April 16, 1990, Jones, who was a friend of T.J.'s older sister, requested that T.J. accompany him and some of his friends on a drive to look for T.J.'s sister and to attempt to buy some marijuana. Ultimately, Jones dropped the others off at their homes but drove T.J. to a wooded area near a park. Jones stopped the car and pulled himself close to T.J. As T.J. tried to fight Jones off, he put his hands

around her neck and started choking her. T.J. opened the car door and half of her body fell out.

{¶ 31} Jones exited the car from the driver's side, took hold of T.J., and forced her up a hill into a wooded area. Jones continued to choke T.J. and also tried to remove her clothing while he threatened her, beat her on the back, and attempted to anally rape her.

{¶ 32} A police car arrived and parked behind Jones's car. A police officer got out of the car and started shining lights around the area. Jones put a hand over T.J.'s mouth and a hand on her throat and threatened to kill her if she said anything. He then attempted to rape her anally. After the police officer drove away, Jones took T.J. back to his car and choked and vaginally raped her.

{¶ 33} Afterwards, Jones told T.J. that he would kill her if she told anyone what he had done. He then drove her home and dropped her off around the corner from her house. T.J. ran home and told her family what happened; her sister called the police. The police arrived and interviewed T.J. and then took her to the hospital for treatment.

{¶ 34} During the trial for the crimes at issue in this appeal, the state introduced T.J.'s medical records, which reflect her treatment at the hospital after the sexual assault in 1990, as well as the certified judgment entry reflecting Jones's convictions for the crimes against T.J.

### *Defense case*

{¶ 35} Jones testified in his own behalf.

{¶ 36} At the outset of his testimony, he addressed T.J.'s testimony. Jones stated that he had first met T.J. around November 1989. Jones said that they had had sex "[a]t least several, maybe four times" before the rape. Jones claimed that the sexual intercourse in the park that formed the basis of the 1990 conviction had been consensual.

{¶ 37} Jones said he never choked T.J. and could not have done so because he has limited mobility in his right arm, which he asserted had been shattered in late 1989 and had led to the surgical removal of the radius bone.

{¶ 38} Jones testified that T.J. may have claimed that she was raped because he had told her that he was not going to leave his girlfriend, Christy Harmel. Nevertheless, Jones explained why he had pled guilty to two counts of attempted rape: "[I]t was my understanding that, the plea agreement, I would be granted super shock probation within 18 months to two years. But it didn't work out that way."

{¶ 39} Jones then testified about his relationship with Yates. Jones stated that he first met Yates in February or early March 2007. Jones had taken Yates, who was then homeless, to his house while his wife was at work; he let her shower, eat, and take some cigarettes. In late March, Jones saw Yates at a McDonald's restaurant and gave her some money to buy food.

{¶ 40} At around 8:45 p.m. on April 22, Jones was driving on Balch Street in Akron and saw a man hitting a woman on the sidewalk. Jones stopped to assist the woman, who was defending herself with a knife. Jones recognized the woman as Yates. Jones broke up the fight and told Yates to get in his car. Jones and the man were "tussling," and Jones alleged that the man punched and scratched Jones. The man then fled the scene.

{¶ 41} Jones returned to the car to find Yates making a "primo" cigarette by inserting crack cocaine into a nicotine cigarette. Jones stated that Yates appeared "kind of battered" from the fight, and her skirt was ripped. She did not have a purse. Yates smoked the cigarette and said she wanted more cocaine.

{¶ 42} Jones drove Yates to the apartment of Deitra Snodgrass because he thought Snodgrass might know someone who was selling crack. Jones and Yates arrived at the apartment and had a short conversation with Snodgrass, but left the apartment without any crack. Thereafter, Jones and Yates bought crack from a

man on a street corner. Jones also purchased some beer and wine at a drive-through market. Jones testified that he had one beer, and Yates drank the rest.

{¶ 43} Jones and Yates decided to go to Mount Peace Cemetery to avoid the police and arrived at 9:00 or 9:30 p.m. Jones had worked as a groundskeeper at the cemetery, and his father had been buried there the previous June.

{¶ 44} Yates prepared three more "primo" cigarettes and smoked them. Jones spread a blanket on the ground, and they got on it and started kissing and hugging. Yates then urinated in the street, wiped herself with tissue that she had in her pocket, and then left the tissue on the roadway in the cemetery.

{¶ 45} According to Jones, he and Yates decided to have vaginal intercourse and did so while he was wearing a condom. He testified that Yates was not wearing underwear and that she had pulled up her skirt and the dress she was wearing underneath. Jones testified that they did not have anal intercourse and that he did not do anything to Yates's anal area.

{¶ 46} Jones testified that Yates told him she wanted to have "rough" sex. According to Jones, Yates told him to put his hands around her throat and restrain her breathing as she neared orgasm. Jones placed one hand around her throat while they engaged in vaginal intercourse. At some point, he "heard like a crack, cracking sound or popping sound." Jones realized that Yates was not moving. He stopped having sex with her and then noticed that the condom had broken. He purportedly used CPR to try to revive Yates but was unsuccessful.

{¶ 47} Once Jones realized that Yates was dead, he panicked because he "had a rape case." He retrieved his blanket—which was partially underneath Yates and partially tangled on Yates's neck—put the blanket in the trunk, and left the cemetery. Around 10:30 or 10:45 p.m., Jones arrived home. Delores was home; he told her that he had been out and had broken up a fight.

{¶ 48} On April 24, Jones read a newspaper article about the police finding a dead woman in Mount Peace Cemetery. Around 4:00 p.m., Jones had a

conversation with Delores. Jones and Delores then walked to a nearby store to buy cigarettes. After returning home, Delores left the house, but Jones did not know where she went.

{¶ 49} Jones then contacted his sister, Yolanda, and drove to her home. They talked, and Jones decided to turn himself in to the police that night. Later that evening, Jones drove back to his house to see if Delores had returned home. The police then stopped and arrested him.

{¶ 50} Jones testified that Yates's death was "an accident." Jones said, "I guess it * * * went too far, [I] applied too much pressure." Jones testified that he did not leave the cross that was found over Yates's eye. And he denied ever seeing the cross that his wife had found in her jewelry box.

{¶ 51} During cross-examination, the state presented a life-size doll and told Jones to demonstrate how he strangled Yates as he had testified on direct, which Jones attempted to do. Jones also testified that he did not cause the injuries to Yates's face and neck and that he had no explanation for the twig found in Yates's rectum or her anal injuries, except to say that "some other guy" might have caused them.

{¶ 52} Jones did not notify the police after he left the cemetery because he thought they would accuse him of intentionally killing Yates. Jones stated that he threw his used condom onto the ground in the cemetery and also left some beer cans.

{¶ 53} Deitra Snodgrass testified on Jones's behalf. She said that Jones and a tall, slender African-American woman came to her apartment during the spring of 2007. Snodgrass testified that the woman was wearing a long, "full-length" denim skirt that was either split or ripped on the side. The woman had bruises on her face, and her face was swollen. Snodgrass had a short conversation with them, and they left.

**{¶ 54}** During cross-examination, Snodgrass conceded that she did not come forward until Jones's brother, whom she referred to as "Uncle Wayne," approached her approximately one week before she took the witness stand and told her that she might need to testify. Snodgrass conceded that the day before she testified, she had told a detective that the woman's denim skirt was short, not long.

### Rebuttal testimony

**{¶ 55}** Dr. Sterbenz refuted Jones's testimony. After using the demonstrative doll to confirm Jones's version of Yates's death, Dr. Sterbenz explained the ways in which the physical evidence contradicted Jones's testimony.

**{¶ 56}** Detective Terrence Hudnall testified that the police found no wine bottle and no beer cans in the cemetery. A used condom was found about 100 yards from the body, but it was not broken.

### The verdict and sentence

**{¶ 57}** The jury found Jones guilty of all counts and specifications. Jones was sentenced to death for the aggravated murder of Yates. He was sentenced to 20 years in prison for the two rape convictions. The court also sentenced Jones to 10 years in prison for the repeat-violent-offender specifications in Counts 3 and 4 and ordered that they be served concurrently with each other, but consecutively to the sentence imposed in Counts 3 and 4, for a total of 30 years.

**{¶ 58}** In his appeal here, Jones presents ten propositions of law in an effort to reverse his convictions. We now turn to those claims.

### ANALYSIS

### Jury selection

**{¶ 59}** *Excusal of death-scrupled jurors*. In proposition of law VI, Jones argues that the trial court improperly excused two prospective jurors for cause who were not unequivocally opposed to the death penalty.

**{¶ 60}** A juror may be excused for cause if his views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 118. A trial court's resolution of a challenge for cause will be upheld on appeal so long as it is supported by substantial testimony. *State v. Wilson*, 29 Ohio St.2d 203, 211, 280 N.E.2d 915 (1972).

### *Prospective juror Pan*

**{¶ 61}** First, Jones argues that the trial court abused its discretion by excusing prospective juror Pan. Jones claims that Pan should not have been excused for cause, because he had indicated on his jury questionnaire and during voir dire that he could impose the death penalty.

**{¶ 62}** In fact, Pan provided contradictory answers on his juror questionnaire and during voir dire. Pan wrote on his questionnaire, "If there is no doubt, death penalty is OK!" During initial voir dire questioning, Pan stated, "I mean, find guilty, was criminal, would be for the death penalty."

**{¶ 63}** But Pan changed his responses about his views on the death penalty as the questioning continued. Pan indicated that he favored life without parole rather than the death penalty. Pan explained that he had problems understanding some of the questions and legal terminology when he initially expressed his views about the death penalty. Nevertheless, Pan indicated that he could vote for the death penalty in some situations. After additional questioning, however, Pan stated that he would be against imposing the death penalty.

**{¶ 64}** Over defense objection, the trial court excused Pan for cause and stated:

12

I thought Doctor Pan has a real problem with the language and understanding, and clearly his testimony here is diametrically opposite of what he had written on his questionnaire, but it was clear that he did not understand what was taking place, and * * * based thereon he was excused having said the maximum that he could find a verdict for would be prison.

**{¶ 65}** " 'The fact that the defense counsel was able to elicit somewhat contradictory viewpoints from * * * jurors during his examination does not, in and of itself, render the court's judgment erroneous.' " *State v. Beuke*, 38 Ohio St.3d 29, 38, 526 N.E.2d 274 (1988), quoting *State v. Scott*, 26 Ohio St.3d 92, 98, 497 N.E.2d 55 (1986). Moreover, it is the trial court's responsibility to determine which answers reflect a prospective juror's true state of mind. *See State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 66.

**{¶ 66}** Pan's responses to questions about the death penalty showed that he could not vote for the death penalty. Additionally, Pan changed his answers about the death penalty because of language problems and his difficulty in understanding the nature of capital proceedings. Thus, the trial court did not abuse its discretion in excusing this juror.

*Prospective juror Powell*

**{¶ 67}** Second, Jones argues that the trial court abused its discretion in excusing prospective juror Powell. Jones claims that Powell should not have been excused, because he stated that he could vote for the death penalty under certain circumstances.

**{¶ 68}** During voir dire, Powell stated that he would have a "real problem" in voting for the death penalty. Powell stated that the only exception would be if "there was a videotape and confession by the individual, they were caught red-handed * * * [o]r they requested that they be put to death, rather than spend their

life in prison." Powell also stated, "I can't imagine that I could take that step, especially knowing that maybe five years from now they come up with a law that says we are not going to do that [impose capital punishment] anymore." Over defense objection, Powell was excused for cause.

{¶ 69} Powell expressed severe doubts about his ability to impose a death sentence when required by law. Instead, Powell expressed his willingness to impose the death penalty only under very narrow circumstances, none of which were present in this case. Thus, the trial court did not abuse its discretion in excusing this juror.

{¶ 70} Because the record supports the trial court's decision to excuse these prospective jurors, we reject proposition VI.

### Evidentiary issues

{¶ 71} *Demonstrative evidence*. In proposition of law I, Jones argues that the trial court abused its discretion by allowing the state to use a demonstrative doll during its cross-examination of him and during the rebuttal testimony of the medical examiner, Dr. Sterbenz.

{¶ 72} On direct examination, Jones testified that Yates died while they were having "rough" sex. Jones stated that as the two began having sex, Yates asked him to place his hands around her throat in order to restrain her breathing as she came close to orgasm. Defense counsel queried, "You have your hands, at least one or both, around her throat; is that correct?" Jones answered, "One of them." Jones further testified that he then heard "a crack, cracking sound or popping sound" and noticed that Yates was not moving.

{¶ 73} Before Jones's cross-examination began, the prosecutor told the court that he anticipated calling Dr. Sterbenz as a rebuttal witness and therefore requested that Dr. Sterbenz be permitted to observe the state's cross-examination of Jones. The defense objected to Dr. Sterbenz's observing Jones's testimony. It also objected to Jones's demonstration on the doll.

{¶ 74} As to the doll, defense counsel argued only:

> [W]e will object to having the State request that Mr. Jones perform
> any type of act on any type of—if I can use the phrase—

The court finished defense counsel's sentence by saying, "Demonstrative doll." Defense counsel continued:

> A doll, all right, your Honor. We are going to object to that. The
> doll is no way close to the body size of Susan Yates. And so what
> we are going to do is state an objection to this. Your Honor, I
> don't think it is a fair comparison; besides the doll is not alive.

{¶ 75} The prosecutor responded, "I have not raised the issue of the doll yet. I didn't mention that, but actually the doll is the same size as Ms. Yates, approximately the same weight and height."[2] The trial court ruled, "Note the objection. He may use it."[3]

{¶ 76} But the trial court sustained the objection to the state's request for Dr. Sterbenz to observe Jones's cross-examination. The prosecutor then informed the court of the state's alternative plan to convey Jones's demonstration to the medical examiner:

---

2. The doll was not marked as an exhibit and is not part of this record. In any event, Jones has abandoned the argument that the doll was dissimilar in size to the victim.

3. Jones asserts that the prosecutor should not have been allowed to use the demonstrative doll, because the defense was surprised that it would be used. Yet defense counsel never mentioned surprise in his objection. And the record does not support Jones's claim. We disagree that defense counsel exhibited surprise by, in objecting to the doll's use, stating only, "It destroys the cross-examination for our side * * *."

Mr. LoPrinzi (the prosecutor): So we are clear on the record, I'm going to have Mr. Jones demonstrate on the dummy what he did, and * * * I will redemonstrate for the doctor, hopefully accurately. I'll do the best I can. I would rather have the doctor see what he does, even if he's just in for that portion.

Mr. O'Brien (defense counsel): It destroys the cross-examination for our side, your Honor.

The Court: You will do the best you can, and if he's not doing it right, they will make that clear. The defense will make that clear.

*Use of the demonstrative doll*

{¶ 77} During cross-examination, the prosecutor asked Jones to use a life-sized doll to demonstrate how he accidentally killed Yates, as he had described on direct examination. The record is far from clear, but it does reflect that Jones left the witness stand and performed some type of demonstration.

{¶ 78} The following exchange took place during the demonstration:

Q (the prosecutor): Can you show me how you grabbed her neck? I assume * * * you were laying [sic] on top of her, correct?

A (the defendant): Yes, sir, I was.

Q: Okay. And you used both hands to do it?

A: Yes, sir.

Q: All right. And how hard did you do it?

A: I was just like applying pressure up here.

Q: Just like that?

A: Yes.

16

Q: No movement?

A: I was * * * having sex with her also at the time.

Q: I'm talking about with your hands around her neck.

A: Just like this.

Q: That was it, steady pressure, just like that?

A: I believe so, yes.

* * *

Q: And other than what you are showing us right there, you did nothing else?

A: I was like this, and I was coming—I mean I was having sex, and I was putting my weight on her like that, both arms, like that.

* * *

Q: And then you heard the pop?

A: Yes, sir.

Q: And when you heard the pop, did she stop moving?

A: Yes, sir.

* * *

Q: All right. Now you can get up. You can get up.

The Court: I think he can sit down.

Mr. LoPrinzi: Yes.

The Court: You can sit down, Mr. Jones.

**{¶ 79}** At the start of Dr. Sterbenz's rebuttal testimony, trial counsel objected to the prosecutor's being allowed to attempt to replicate Jones's demonstration with the doll. The trial court overruled the objection and stated, "[T]he jury will remember what was produced now and determine whether it is

the same, similar or not at all." The prosecutor then used the doll in framing the following question:

> Q: Doctor, the defendant indicated he put both hands around her neck in this fashion, was up on both feet, over the top of her engaged in intercourse with all his weight pressed on her neck in that fashion, never did anything additional but put pressure.
>
> During that period of time, she was moving her arms on his arms, mumbling and engaging in sex, sexual activity with him or sex act, at which time he heard a pop in her neck area. She stopped moving. He then stopped choking her, and she was dead as he tried to revive her.

{¶ 80} The prosecutor then asked Dr. Sterbenz "whether that scenario is consistent with [his] medical findings." Before providing his opinion, Dr. Sterbenz took the doll and expressed his understanding of what he had just been told:

> A (Dr. Sterbenz): I'd like to clarify the circumstances or the terms * * * I will refer to as strangulation, for purposes of being very clear here, and I'm interpreting this as * * * a description of how the event occurred, I'm interpreting as any other hypothetical that I would have placed before me and asked my opinion[.]
>
> Q (the prosecutor): That's what we are asking.
>
> * * *
>
> The Witness: One, can I approach the dummy?
>
> The Court: You may.

A: What you are telling me is that the person, this individual is forward on—I mean, straddling this person and the hands are placed about the neck, gripping the neck, right and left hand gripping the neck.

Also what you are telling me is that, I'm interpreting at least, if I'm wrong I would like to be corrected, that the hands other than gripping the neck and squeezing the neck, are otherwise static on the neck.

Q: That's his testimony.

* * *

A: I'm also assuming that the individual themself [sic], this case a dummy, is not in any way moving their hands in such a way to claw or grab or try to pry the hands off of her neck?

Q: That's his testimony.

A: Okay. And that the weight of this individual is in front to back direction as I am demonstrating, as I'm positioned here. I mean, front to back of the dummy, pushing front, pushing straight down, not to the side or anything. * * * [I]t is just pushing down on the neck and squeezing the neck.

Q: That's how it was shown.

{¶ 81} Dr. Sterbenz opined that the physical evidence did not support Jones's explanation about how Yates had died. Dr. Sterbenz explained that "[s]imply placing hands on the neck and squeezing would not yield that type of pattern of injury" that Yates suffered. He stated that the fractures of the cornu and hyoid bone resulted from a "violent squeezing force to the neck." Dr. Sterbenz also testified that "asphyxiation takes quite a number of minutes to occur, and after unconsciousness occurs, the pressure then needs to be maintained until death

is accomplished. And she has quite a bit of obvious petechia[e] on her face and eyes indicating that this is the type of pressure that occurred."

*Applicable law*

**{¶ 82}** Demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evid.R. 401[4] and if it is substantially similar to the object or occurrence that it is intended to represent. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 90; *State v. Palmer*, 80 Ohio St.3d 543, 566, 687 N.E.2d 685 (1997). The admission of demonstrative evidence is subject to Evid.R. 403.[5] The trial court has discretion to determine whether demonstrative evidence is helpful or misleading to the trier of fact. *State v. Cowans*, 87 Ohio St.3d 68, 77, 717 N.E.2d 298 (1999). A trial court's ruling on the admission of demonstrative evidence is reviewed under the abuse-of-discretion standard. *State v. Herring*, 94 Ohio St.3d 246, 255, 762 N.E.2d 940 (2002). *See also* Travers, *Propriety of Requiring Criminal Defendant to Exhibit Self, or Perform Physical Act, or Participate in Demonstration, During Trial and in Presence of Jury*, 3 A.L.R.4th 374 (1981).

**{¶ 83}** We will address the two prongs of admissibility in turn.

*Relevance*

**{¶ 84}** The prosecutor's use of the doll during cross-examination of Jones and during Dr. Sterbenz's rebuttal testimony was relevant to Jones's claim that he had accidentally killed Yates. *See State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), quoting *Hanoff v. State*, 37 Ohio St. 178 (1881), paragraph one of the syllabus.

---

4. " ' Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

5. "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

**{¶ 85}** In *Landrum*, the defendant testified on his own behalf during his murder trial. On direct examination, Landrum stated that he used a knife only to threaten the victim and that he did not cut the victim's throat. *Id.* at 109. During cross-examination, the prosecutor handed the knife to the defendant and asked him to hold the knife just as he had on the night of the murder. *Id*. at 110. As an initial matter, we noted, "[T]he cold record does not reflect theatrics as Landrum claims." *Id.* at 111. We then found no plain error in the court's allowing the demonstration because it was relevant to impeach the defendant. *Id.*, quoting *Hanoff*, paragraph one of the syllabus. In so holding, we explained, " 'Where upon a trial of an indictment the defendant offers himself as a witness, and testifies in his own behalf, he thereby subjects himself to the same rules, and may be called on to submit to the same tests as to his credibility as may legally be applied to other witnesses.' " *Id.*, quoting *Hanoff*, paragraph one of the syllabus.

**{¶ 86}** Jones's demonstration showed how he placed his hands around Yates's neck, as he had described on direct examination. But Jones's story changed. On direct examination, Jones expressly testified that he used one hand to restrain Yates's breathing. On cross-examination, Jones demonstrated that he had used two hands to do so. This discrepancy is obvious from the record and would have been glaring to the jurors.

**{¶ 87}** Similarly, the prosecutor and Dr. Sterbenz used the doll during Dr. Sterbenz's rebuttal testimony to clarify Jones's explanation about what happened with Yates. In turn, Dr. Sterbenz used autopsy photographs to explain that it was physically impossible for Jones to have killed Yates in the manner that he had demonstrated.

**{¶ 88}** First, Dr. Sterbenz explained that Jones's placing of his hands on Yates's neck and squeezing would not produce the complex pattern of abrasions that were present on Yates's neck. To the contrary, Yates had upward abrasions that were consistent with a force "where there is twisting of one surface against

the other, possible for skin to skin contact with very vigorous activity, but a soft ligature in between, such as twists of clothing about the neck is certainly another definite consideration." Dr. Sterbenz explained in contrast, "Simply placing hands on the neck and squeezing would not yield that type of injury." In addition, the severity of the bruising on Yates's neck was not consistent with simply squeezing but rather "shows a violent act, level of force, and that is commonly conceived as or interpreted as violent."

{¶ 89} Next, Dr. Sterbenz explained that Jones's explanation that Yates's arms were not near her neck as Jones "restrained her breathing" was not credible because Yates's neck had "gouging," "fingernail type" injuries, which "speak[ ] to the concept that the victim is grasping at their neck and also clawing to try to move, remove whatever is the strangulation force around her neck."

{¶ 90} Dr. Sterbenz further explained that Yates had a bruise on the left side of her neck that was not a mark that would be left by a hand. "This is not a hand mark, this is no kind of mark that would be simply imparted by a hand statically squeezing the neck by any means." He also referred to a "big broad abrasion under the chin" that could not be explained by Jones's version of events.

{¶ 91} Regarding internal injuries, Dr. Sterbenz explained that there was a "hemorrhage along the left side of the larynx surrounding the blood vessels on the left side of the neck" that was inconsistent with Jones's explanation. Rather, that injury would be caused "from vigorous moving, vigorous, violent movement at the neck."

{¶ 92} Dr. Sterbenz explained that one would expect to find the thyroid cartilage to be fractured under Jones's version of events—and it was. But he explained that Yates's fracture was a crack that was less than a centimeter and, from his professional experience with autopsy procedures, he knew that such a fracture would not produce a "pop." The medical examiner addressed each of the

remaining fractures that he found in Yates's neck and explained that none of them would produce a "pop."

{¶ 93} Additionally, Dr. Sterbenz pointed out that Jones had claimed that there was no other movement. But the autopsy revealed large bruises on the back of the head that indicated that Yates's head had been subjected to a "pounding action."

{¶ 94} Finally, Dr. Sterbenz explained that if Yates had gone limp and died immediately thereafter—as Jones claimed—one would expect to find some kind of injury to the spinal cord. Dr. Sterbenz found no such injury. Instead, Dr. Sterbenz discovered that Yates had fracturing of the larynx, which "is not going to result in a neurologic injury that would result in her suddenly going limp and sudden death." To further explain, Dr. Sterbenz testified that Yates died from strangulation relating to neck compression, which restricts the blood flow and which would have had to have been maintained for some time after Yates became unconscious. In sum, Dr. Sterbenz found all of Jones's explanation of the strangulation to be inconsistent with the autopsy.

{¶ 95} Jones's demonstration directly aided the jury in understanding, and thus assessing, the credibility of his version of events. Likewise, use of the demonstrative doll during rebuttal aided the medical examiner's understanding of Jones's explanation of the critical events and his ability to scientifically assess Jones's story. In turn, the jury was aided by Dr. Sterbenz's opinion.

{¶ 96} We readily conclude that the demonstrative evidence was relevant to Jones's claim that he accidentally killed Yates.

*Similarity*

{¶ 97} The demonstrations were the same as or similar to the events that they were intended to represent. Jones's demonstration involved testimony about his own conduct. Before providing the relevant testimony, Jones twice unequivocally stated that he recalled the night of Yates's murder. In any event,

23

any dissimilarity between Jones's demonstration on the doll and his actions with Yates did not give rise to unfair prejudice. *See Moore v. Texas*, 154 S.W.3d 703, 708 (Tex.App.2004) (defendant's use of a doll during cross-examination was fair comparison to act in question because defendant demonstrated his own conduct).

{¶ 98} And nothing in the record indicates that the prosecutor's and the medical examiner's use of the doll during rebuttal was different from Jones's demonstration. Indeed, Jones's counsel lodged no objections to the accuracy of the replications and engaged in no cross-examination based on any alleged discrepancies.

{¶ 99} Further, the trial court, which viewed the doll before ruling on its use, did not abuse its discretion in concluding that the demonstrative doll could be used because it was similar in size to the victim. " 'An exhibit is not necessarily incompetent because it fails to show some exact thing in connection with the subject under investigation, provided it shows some matter bearing directly upon the matter under investigation, with an explanation of how it differs from that which is being investigated.' " *State v. Cowans*, 87 Ohio St.3d 68, 77, 717 N.E.2d 298 (1999), citing *Cleveland Provision Co. v. Hague*, 20 Ohio C.C. (N.S.) 34, 41 Ohio C.C. 223, *aff'd,* 87 Ohio St. 483, 102 N.E. 1121 (1912), and citing *State v. Palmer*, 80 Ohio St.3d 543, 564-566, 687 N.E.2d 685 (1997).

{¶ 100} In any event, Jones no longer claims that the use of the doll was unfair because of its lack of similarity to the victim. Indeed, he now concedes that "[t]he doll was approximately the same size of Ms. Yates." Thus, nothing shows that the trial court abused its discretion because of the doll's alleged lack of similarity to the victim.

*Evid.R. 403*

*Unfair prejudice*

{¶ 101} Jones contends that the use of the doll resulted in unfair prejudice because it improperly "focused the jury's attention on only the cross-examination

of Appellant, to the exclusion of the rest of the evidence." Jones did not raise this objection at trial; therefore, he has waived all but plain error. *See State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 58. Neither plain nor any other error occurred.

{¶ 102} As an initial matter, we, like the court in *Landrum*, note that the cold record does not reflect the theatrics Jones claims occurred at trial. While conceding that the record is "not entirely clear," Jones suggests that "it appears Appellant was asked to lay [sic] on top of the doll, apply pressure to the neck with both hands, mimicking having sex."[6]

{¶ 103} A review of the transcript reveals that Jones was never asked to simulate sexual intercourse with the doll. And there is no reason to believe that he, in fact, did engage in such a simulation. We once again consider the following exchange for example:

> Q (the prosecutor): Can you show me how you grabbed her neck? I assume * * * you were laying [sic] on top of her, correct?
>
> A (the defendant): Yes, sir, I was.
>
> Q: Okay. And you used both hands to do it?
>
> A: Yes, sir.
>
> Q: All right. And how hard did you do it?
>
> A: I was just like applying pressure up here.
>
> Q: Just like that?
>
> A: Yes.
>
> Q: No movement?

---

6. At oral argument, counsel for Jones also argued that the court ordered Jones to "simulate the sex acts" and "the strangulation." The record does not reflect that the trial court issued any such directives to Jones.

A:  I was * * * having sex with her also at the time.

Q:  I'm talking about with your hands around her neck.

{¶ 104} This exchange reveals that the prosecuting attorney questioned Jones about the placement of his hands around Yates's neck, the amount of pressure he applied to her neck, and the movement of his hands on her neck. When Jones referred to the sexual intercourse, it was the prosecuting attorney who actually redirected Jones to the strangulation.

{¶ 105} Indeed, Jones's demonstration related to the strangulation, which he claimed to be accidental, not to the intercourse, which he claimed to be consensual.  And the medical examiner's clarifying questions and rebuttal testimony focused squarely on the position of Jones's hands around Yates's neck and the nature and direction of the pressure that Jones claimed to apply.

{¶ 106} Moreover, the prosecutor used the doll only during a short segment of his cross-examination of Jones and the rebuttal testimony of Dr. Sterbenz.  The transcript of the guilt phase of the trial is more than 2,000 pages; the portion reflecting the use of the demonstrative doll by both witnesses totals seven pages, strongly suggesting that the demonstration was not unduly sensational or prolonged.

{¶ 107} Finally, the demonstration was not per se unfairly prejudicial in requiring Jones to leave the witness stand to conduct the demonstration. Prosecutors are allowed to ask the defendant during cross-examination to step down from the stand and demonstrate his or her conduct.

{¶ 108} In *State v. Harris*, 2d Dist. No. 94 CA 37, 1995 WL 614348 (Oct. 18, 1995), the defendant testified that he did not intend to kill the victim when he fired shots.  *Id*. at *5.  The prosecutor then asked the defendant during cross-examination to step down from the stand and to demonstrate the angle at which he had held the gun when he fired the shots.  The prosecution also asked the

26

defendant to approximate, by reference to another person involved in the demonstration, the distance that had existed between himself and the objects struck by the bullets. *Id.* The state used this demonstration to show that it was physically impossible for a bullet fired as the defendant demonstrated to have struck the objects he indicated. *Id.* In upholding the admission of the demonstration, the court stated, "It related directly to the veracity of Harris's sworn statements and was a proper subject of cross-examination." *Id.* We adopt *Harris*'s reasoning and likewise conclude that the demonstration here related directly to Jones's veracity and was a proper subject of cross-examination.

{¶ 109} We reject Jones's claim that the demonstration was unfairly prejudicial.

*Confusion of the issues and misleading the jury*

{¶ 110} The prosecutor's purpose in using the demonstrative doll was obvious and would not have confused the issues or misled the jury. The entire case turned on Jones's claim that he had accidentally killed Yates while they were having rough sex. His demonstration and the prosecutor's use of the doll during rebuttal were plainly for the purpose of impeaching Jones and to counter his testimony, which—if believed—would have constituted a defense to all of the charges contained in the indictment.

{¶ 111} Based on the foregoing, we overrule proposition I.

{¶ 112} ***Excited utterances by Jones's wife***. In proposition of law II, Jones argues that the trial court erred in admitting his wife's statements to Jeffries and Detective Morrison as excited utterances. Jones contends not only that the statements did not meet the definition of excited utterance, but that their admission violated the spousal privilege and the Confrontation Clause. For clarity's sake, we will address Jones's spousal-privilege claim first.[7]

---

7. In light of the dissent's mischaracterization of the presentation of witnesses, we are compelled to point out that although we address Delores's testimony first, she was the seventh witness to

### *Spousal privilege*

{¶ 113} Spousal privilege is codified at R.C. 2945.42 and provides:

Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness, or in case of personal injury by either the husband or wife to the other * * *.

{¶ 114} The R.C. 2945.42 privilege belongs to the nontestifying spouse. *State v. Savage*, 30 Ohio St.3d 1, 2, 506 N.E.2d 196 (1987). "Spousal privilege cannot be waived unilaterally and allows a defendant to prevent his or her spouse from testifying [as to privileged communications] unless one of the statute's exceptions applies." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 55, fn. 3.

### *Delores's testimony*

{¶ 115} Before trial began, the trial court advised Jones's wife, Delores, that she did not have to testify against Jones because he was her husband. Delores said that she wished to testify.[8] But because Jones asserted spousal privilege, the

testify on behalf of the state. Curiously, the dissent claims the following order of witnesses: Delores, Jeffries, Morrison. In fact, the order was exactly the opposite. The dissent's misstatement was presumably made for dramatic effect in order to make the claim that after Delores's testimony, "the jurors were left on the edges of their respective seats" awaiting testimony from Detective Morrison and Jeffries about the content of Jones's statements to Delores. It is concerning that the misstatement was possibly made out of a lack of familiarity with the record. Given the interests at stake in this case, either is irresponsible. As the dissent explains in another context, "the order of events is critical."

8. Evid.R. 601 provides, "Every person is competent to be a witness except: * * * (B) A spouse testifying against the other spouse charged with a crime except when * * * (2) the testifying spouse elects to testify." Spousal competency is not an issue because Delores elected to testify. Indeed, Jones does not challenge Delores's testimony on the basis of spousal competency.

trial court ruled that Delores would not be allowed to testify "as to anything [Jones] told her relative to this matter."

{¶ 116} Consistent with that ruling, Delores testified during the state's case-in-chief that at around 4:00 p.m. on April 24, Jones was at home reading the newspaper and watching the news on television. She testified that she and Jones had a conversation about something that was on the news, but she did not testify about what they discussed. "A little while later," they walked to a store because Jones wanted to get some cigarettes.

{¶ 117} After returning home, Delores drove to the home of her friend, Jeffries. Delores testified that she was "[h]ysterical, upset, and hyperventilating." Delores also testified that she arrived at Jeffries's home and told Jeffries what her husband had said.

{¶ 118} Delores and Jeffries then called the police; Delores spoke to someone at the detective bureau and stated that she "wanted to speak to somebody in charge" about the dead woman found in the cemetery. Shortly thereafter, Detective Morrison arrived at Jeffries's home, and Delores told him what Jones had said. Delores stated that when she talked to Morrison, she was still upset and scared.

{¶ 119} Delores was not asked—and did not testify—as to the communication between her and Jones. Therefore, Delores's testimony did not violate Jones's spousal privilege.

*Jeffries's and Morrison's testimony*

{¶ 120} Jones contends that his spousal privilege was violated by the trial court's permitting Jeffries and Detective Morrison to testify that Delores had told them that Jones had told her that he killed the woman found in the cemetery. We reject this argument because spousal privilege is wholly inapplicable to the testimony of a third party. *See State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104.

**{¶ 121}** In *Perez*, police investigators recruited the defendant's wife to visit her husband in jail and "do some taped conversations." *Id*. at ¶ 108. Perez's wife agreed to allow her conversations with Perez to be recorded. *Id*. Before trial, Perez filed a motion to suppress the taped conversations on the ground that their admission would violate the marital privilege. Perez argued that admitting the taped conversation was equivalent to allowing his wife to testify to the content of the conversation. *Id*. at ¶ 112. The trial court allowed the tapes to be played at trial. *Id*. at ¶ 109.

**{¶ 122}** We held that the admission of the taped conversations did not violate R.C. 2945.42 because they were not introduced by way of the defendant's wife's testimony. *Id*. at ¶ 120-122. We emphasized, "R.C. 2945.42 specifies that a '[h]usband or wife shall not *testify* concerning a communication made by one to the other * * *.' (Emphasis added.) Thus, on its face, the statute does no more than preclude a spouse from *testifying* to the other spouse's statements." (Emphasis sic.) *Id.* at ¶ 113.

**{¶ 123}** In so holding, we agreed with the Michigan Supreme Court's analysis in *People v. Fisher*, 442 Mich. 560, 503 N.W.2d 50 (1993). *Perez* at ¶ 114. In *Fisher*, the court held that Michigan's spousal-privilege statute, which provided that one spouse could not, without the other's consent, " 'be examined as to any communication made by one to the other during the marriage,' " did not apply to preclude a sentencing court's consideration of out-of-court hearsay statements made by the defendant's wife. *Id*. at 568, quoting Mich.Comp.Laws 600.2162.

**{¶ 124}** Fisher had fatally stabbed the boyfriend of his estranged wife, Mary. *Id.* at 563. At trial, Fisher claimed that he had accidentally stabbed the victim when he (Fisher) came to Mary's aid as her boyfriend was physically abusing her. *Id.* at 564. The jury rejected Fisher's version of the events and convicted him of second-degree murder. *Id.* At sentencing, the court considered

statements that were attributed to Mary and that were contained in the presentence report. *Id.* at 565-566. The report reflected, among other things, that Mary told a police officer that Fisher had admitted to her that he had stabbed the victim on purpose. *Id.* at 566. In holding that Michigan's spousal privilege did not apply, *Fisher* concluded:

> The statute provides that neither spouse may "be examined" with respect to any communication made by one to the other during the marriage. This phrase, "be examined," connotes a narrow testimonial privilege only—a spouse's privilege against being questioned as a sworn witness about the described communications. In other words, the spouse must testify for the privilege to apply. The introduction of the marital communication through other means is not precluded.

*Fisher* at 575.

{¶ 125} In *Perez*, we agreed with and relied on *Fisher's* analysis in concluding that Ohio's statutory spousal privilege did not apply to evidence introduced through a third party:

> "In construing a statute, we may not add or delete words." *State v. Hughes* (1999), 86 Ohio St.3d 424, 427, 715 N.E.2d 540. R.C. 2945.42 states that a "[h]usband or wife shall not testify concerning a communication made by one to the other * * *." Like the phrase 'be examined' in Michigan's statute, the word "testify" in R.C. 2945.42 clearly precludes the spouse's testimony. Just as clearly, it does not preclude "introduction of the marital communication through other means."

*Perez* at ¶ 120, quoting *Fisher*, 442 Mich. at 575, 503 N.W.2d 50.

{¶ 126} We noted that our decision was in accord with the fundamental principle of construing privileges narrowly. *Id.* at ¶ 121 ("Privileges are to be construed narrowly because they impede the search for truth and contravene the principle that the public has a right to everyone's evidence"); *see also Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).

{¶ 127} And the *Perez* holding was also in accord with long-standing precedent. In *Hanley v. State*, 5 Ohio C.D. 488, 12 Ohio C.C. 584, 1896 WL 558 (1896), a decision of one of our appellate courts that was published more than a century ago, the defendant had been convicted of bigamy. At trial, the state sought to introduce into evidence a letter that Hanley had written to his first wife, which contained expressions that indicated that their marriage continued. *Id.* at 489. The letter was authenticated by the marshal of Sandusky, who testified that a woman who claimed to be the defendant's first wife had delivered it to him voluntarily. *Id.* Hanley unsuccessfully moved to suppress the letter on the ground that its admission would violate Ohio's spousal-privilege statute. *Id.*

{¶ 128} The appellate court affirmed the use of the letter, explaining that the plain language of the statute "only provides that the husband or wife shall not testify * * *. It does not prevent the introduction of [a spousal communication] into evidence." *Id.* at 491.

{¶ 129} The court further explained that the spousal-privilege statute was generally understood not to provide protection to spousal communications that had been disclosed to a third party. *Id.* As the court wrote:

> [I]f either of these parties divulge these things by giving the
> written communication to another, or if that communication is
> disclosed by a robbery of the mails, or otherwise, and it gets into

the hands of a third person, and the issue be raised, it is clear that that third person may, if he be a witness in the case, offer that communication.

*Id.*

{¶ 130} Resolution of Jones's claim requires only a straightforward application of *Perez.* Because the content of the conversation between Jones and Delores was not introduced by way of Delores's testimony, R.C. 2945.42 is wholly inapplicable.

### Admission of out-of-court statements

{¶ 131} We now turn our attention to the rules that apply to the admission of these out-of-court statements—the federal Confrontation Clause and our Rules of Evidence. In doing so, we first more fully detail the relevant trial testimony.

### Jeffries's and Morrison's testimony

{¶ 132} Jeffries testified that Delores arrived at her home between 4:30 and 5:00 p.m. on April 24. Delores immediately ran upstairs to Jeffries. Delores was "upset" and "screaming." Jeffries noticed that Delores was wearing shoes even though Delores knew that the rule was no shoes inside the house. Jeffries and Delores then had the following exchange:

> A: I said: Delores, take your shoes off. And that's when she begins to say: He did it, he did it.
>
> * * *
>
> Q: And you said what now?
>
> A: He, who? And she said: My husband, Phil. And I said: Did what? And she said: Murdered the woman. And I said: What woman? And she said: The woman that they found in the cemetery.

**{¶ 133}** Jeffries testified that Delores then called the police. Delores was "really upset" and kept dialing the wrong number. Morrison arrived at Jeffries's home "[p]robably ten minutes" after the phone call.

**{¶ 134}** Morrison testified that he had been assigned to investigate Yates's murder and that another detective, Detective Urbank, had called him at home around 5:00 p.m. on April 24 and said that a woman wanted to speak with the detective working on the case of the dead woman found at the cemetery. Urbank told Morrison that the woman was emphatic that she wanted to speak to someone working that day.

**{¶ 135}** Morrison drove to Jeffries's home immediately after the call and met Delores inside the house.[9] Morrison described his meeting with Delores:

> A: I couldn't quite figure her out at first, she kept running back and forth, looking out the windows and pacing, making sure no one was coming. She was hyperventilating and basically hysterical with me. And basically I said: Look, you called me. And that's when I asked her: Do you have something you need to tell me? You called me out. And she said: My husband is the one that killed that girl in the cemetery.
>
> Mr. O'Brien (defense counsel): Objection, hearsay.
>
> The Court: Note the objection, overruled.
>
> Q: And when she told you that, * * * what was your response?

---

9. Jeffries testified that when Detective Morrison arrived to interview Delores, Jeffries excused herself because she did not want to hear the discussion between Delores and Detective Morrison. Yet the dissent blames the majority for "ignoring the fact that Delores repeated the story to Detective Morrison in Jeffries's home *in the presence of Jeffries*." (Emphasis added.) The "fact" relied on by the dissent is, in fact, fiction.

A: I was as shocked as anybody. I actually had to ask her, tell her to calm down: Are you sure? How do you know this? And she said: Because he told me her name was Susan. Isn't it Susan? Is it Susan?

* * *

Q: Delores Jones tells you that her husband is the one that killed the woman in the cemetery, and that he told her * * * the woman's name is Susan?

A: Yes.

Q: And you indicated previously that that information had not been released to the press, correct?

A: That was only known to us.

{¶ 136} Admission of an out-of-court statement must comport with both constitutional dictates and evidentiary law. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Because certain testimonial statements are barred by the Confrontation Clause of the Sixth Amendment to the United States Constitution irrespective of their admissibility under the Rules of Evidence, we undertake the constitutional inquiry first. *See id.*

Crawford *inquiry*

{¶ 137} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant had had a prior opportunity to cross-examine the witness. *Crawford* at 54.

**{¶ 138}** At the threshold, we hold that even though Delores testified at trial, she was unavailable for purposes of the Confrontation Clause because Jones had invoked the spousal privilege.

**{¶ 139}** The facts of *Crawford* are substantially similar to those of this case as to the unavailability of the witness. In *Crawford*, the defendant invoked the marital privilege to keep his wife, Sylvia, from testifying against him at trial. *Id*. at 40. During trial, the state played the wife's tape-recorded statement to police that described the offense he committed. *Id.* Noting that the wife had admitted facilitating the offense, the state invoked the hearsay exception for statements against penal interest. *Id.* Crawford countered that admitting this evidence violated his Sixth Amendment rights. *Id*. During appeals in state court, the state had argued that Crawford waived his right to confrontation when he neglected to call his wife to testify. *State v. Crawford*, 147 Wash.2d. 424, 429, 54 P.3d 656 (2002). The Supreme Court of Washington rejected this argument and held that the defendant did not waive his right to confrontation when he invoked the marital privilege. It reasoned that "forcing the defendant to choose between the marital privilege and confronting his spouse presents an untenable Hobson's choice." *Id*. at 432.

**{¶ 140}** The Supreme Court expressly did not reach the waiver argument because the state did not challenge that portion of the decision. *Crawford*, 541 U.S. at 42, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 1. Nevertheless, it did conclude that "[i]n this case, the State admitted Sylvia's testimonial statement against petitioner, *despite the fact that he had no opportunity to cross-examine her*. That alone is sufficient to make out a violation of the Sixth Amendment." (Emphasis added.) *Id*. at 68.

**{¶ 141}** Similarly here, the state does not argue that Jones waived his Sixth Amendment right to confront Delores by invoking the spousal privilege. *See State v. Keairns*, 9 Ohio St.3d 228, 460 N.E.2d 245 (1984), paragraph one of

the syllabus (Confrontation Clause requires the prosecution, as the proponent of the evidence, to show unavailability of a witness). Nor does the state argue that Jones had (but failed to pursue) the opportunity to cross-examine Delores while she was on the stand.

{¶ 142} Consistent with *Crawford*, we hold that Delores was unavailable as a witness because Jones invoked the spousal privilege and that he had had no prior opportunity to cross-examine her.[10] In doing so, we, as in *Crawford*, need not reach the waiver issue because it has not been asserted by the state.

{¶ 143} Thus, the admission of Delores's statements pass constitutional muster only if they are nontestimonial for purposes of the Confrontation Clause. Accordingly, we must now determine whether Delores's statements to Morrison and Jeffries were testimonial. Doing so involves different inquiries for Morrison and Jeffries, because Morrison was a responding police officer.

*Statements to Morrison*

{¶ 144} In *Crawford*, the court explained that whatever else the term "testimonial evidence" covers, "at a minimum, it applies to * * * prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. Since then, the court has expended considerable effort expounding on the meaning of "testimonial" in the context of police interrogation.

{¶ 145} Two years after its decision in *Crawford*, the court revisited the issue in the consolidated cases of *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In these cases, the court distinguished between police interrogations that concern an ongoing emergency

---

10. This finding does not conflict with our holding in *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104. In *Perez*, the defendant claimed that he was denied his right to confrontation because tape-recorded conversations between him and his wife were played during a police officer's testimony rather than during his wife's testimony. *Id*. at ¶ 126. In rejecting that claim, we did not address the issue of his wife's unavailability because of spousal privilege.

and those that relate to past criminal conduct. In considering whether the statements made in the context of these two different scenarios were testimonial, the court formulated the primary-purpose test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 822.

{¶ 146} *Davis* involved statements that a domestic-violence victim made to a 9-1-1 operator identifying her assailant and describing his whereabouts immediately after an assault. *Id*. at 817-819. Applying the test, the court determined that "the circumstances of [the 9-1-1] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." *Id*. at 828. The court reasoned that "the nature of what was asked and answered [during the 9-1-1 call], again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." (Emphasis sic.) *Id*. at 827. In addition, the call "was plainly a call for help against bona fide physical threat" and involved "frantic answers" given "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id*. Accordingly, the court held that these statements were nontestimonial. *Id.* at 828.

**{¶ 147}** *Hammon* involved a victim's statements to police officers responding to a domestic-violence complaint after they had secured the scene. *Id*. at 819-820. The court held that these statements were testimonial and were barred by the Sixth Amendment. *Id*. at 829-832. The court stated that there was "no immediate threat" to the victim and "no emergency in progress," because the police had separated the abusive husband from the wife. *Id*. at 829-830. The court reasoned that when the officer questioned the victim, he was "not seeking to determine (as in *Davis*) 'what is happening' but rather 'what happened.' " *Id*. at 830. The court concluded that "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime * * * ." *Id*.

**{¶ 148}** In *Michigan v. Bryant*, __U.S.__, 131 S.Ct. 1143, 1156, 179 L.Ed.2d 93 (2011), the court provided further explanation of the "ongoing emergency" discussed in *Davis*. In *Bryant*, police officers responding to a shooting call found the victim, Anthony Covington, lying on the ground with a gunshot wound. *Id.* at 1150. Police officers asked Covington " 'what had happened, who had shot him, and where the shooting had occurred.' " *Id*., quoting *People v. Bryant*, 483 Mich. 132, 143, 768 N.W.2d 65 (2009). Replying that "Rick" (the defendant) had shot him, Covington told the police that he had gone to Rick's house and had a conversation with him through the back door. *Id.* Covington explained that when he turned to leave, he was shot through the door and then drove to the gas station where the police found him. *Id.* Covington died within hours. *Id*. At trial, police officers who spoke with Covington testified about what Covington had told them. *Id*. The perpetrator was at large.

**{¶ 149}** The United States Supreme Court held that Covington's identification and descriptions of Bryant and the location of the shooting were nontestimonial statements because the primary purpose of the statements was to enable police to meet an ongoing emergency. *Bryant* at 1166-1167. In reaching

its decision, the court provided further clarification of the "ongoing emergency" circumstance that occurs in the context of a nondomestic dispute that "extends beyond an initial victim to a potential threat to the responding police and the public at large." *Id.* at 1156.

{¶ 150} *Bryant* emphasized that in assessing whether a statement is testimonial in such a case, the ultimate inquiry focuses on whether the primary purpose of the interrogation is to meet an ongoing emergency or to establish past events for later criminal prosecution. *Id.* at 1156-1157. In such an inquiry, a court must "objectively evaluate the circumstances in which the encounter occur[red] and the statements and actions of the parties." *Id*. at 1156. The focus is not on the subjective or actual purpose or intent of the interrogator or the declarant, but on "the purpose that reasonable participants would have had" under the same circumstance. *Id*. The court cautioned that the focus must be on the perspective of the parties at the time of the interrogation, and not based on hindsight, for "[i]f the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause." *Id*. at 1157, fn. 8.

{¶ 151} The court also emphasized that "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Bryant,* ___ U.S. ___, 131 S.Ct. at 1158, 179 L.Ed.2d 93. The court noted that "[d]omestic violence cases like *Davis* and *Hammon* often have a narrower zone of potential victims than cases involving threats to public safety." *Id*. The court explained that "[a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id*. The court also stated that "the duration and scope of an emergency may depend in part on the type of weapon employed." *Id*. In *Bryant*, the victim

had been mortally wounded, the weapon was a gun, and the police had not known the identity of the shooter. Under these circumstances, the shooter continued to pose a threat to Covington and possibly others because he was still on the loose. *Id*. at 1166.

{¶ 152} The court also noted, as it had in *Davis*, that " 'a conversation which begins as an interrogation to determine the need for emergency assistance' " can " 'evolve into testimonial statements.' " *Id.* at 1159, quoting *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court explained:

> This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude "the portions of any statement that have become testimonial * * *."

*Id*. at 1159, quoting *Davis* at 829.

{¶ 153} The court stressed that "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.* at 1160.

{¶ 154} Another factor involves the informality of the encounter, because "formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution.' " *Id*., quoting *Davis* at 822. In

*Bryant*, the police encountered a "fluid and somewhat confused" situation. *Id*. at 1166. Their questioning lacked formality because it "occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion." *Id*. at 1160.

{¶ 155} The court also stated that "the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id.* The court stated, "*Davis* requires a combined inquiry that accounts for both the declarant and the interrogator. In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers." *Id*. at 1160-1161. Additionally, the court stated, "Objectively ascertaining the primary purpose of the interrogation by examining the statements and actions of all participants is * * * the approach most consistent with our past holdings." *Id.* at 1162.

{¶ 156} Viewed objectively, the totality of circumstances surrounding Delores's statements to Morrison demonstrate that the "primary purpose" of Morrison's questioning was to obtain information about Yates's murder. We recognize that some of the facts tend to demonstrate that initially Jones appeared to pose a continuing threat to Delores and maybe others. When Morrison arrived at Jeffries's home, he was unsure of what he was going to encounter. He found Delores, who was "hysterical" and afraid and who "kept running back and forth, looking out the windows and pacing, making sure no one was coming." Moreover, this encounter occurred at Jeffries's home, an informal setting, and not the police station.

{¶ 157} On the other hand, Morrison was not dispatched to an active crime scene, unlike in *Bryant* and *Davis*. He went to Jeffries's home because he was told that a person had information about Yates's death. Her body had been found the previous day at a different location. No gun was involved in Yates's killing. Thus, although the police were still trying to identify and apprehend an

at-large perpetrator, Morrison's arrival at Jeffries's home and his contact with Delores did not occur in the midst of an ongoing emergency as in *Davis* and *Bryant*. And they were not faced with the same type of ongoing threat as in *Bryant*. Moreover, Morrison's arrival at Jeffries's home greatly reduced any immediate threat to Delores.

{¶ 158} From Delores's perspective, she called police to report that her husband had confessed to killing the woman found in the cemetery. She insisted on speaking with "someone in charge." And although Delores was nervous and afraid, there is no indication that Jones had threatened her in any way.

{¶ 159} For all of these reasons, we conclude that Delores's statements to Morrison were testimonial, and their admission into evidence violated the Confrontation Clause.

*Statements to Jeffries*

{¶ 160} Delores's statements to Jeffries do not involve police interrogation. Therefore, in order to resolve the Confrontation Clause question, we look to *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one of the syllabus, which sets forth the applicable test.

{¶ 161} In *Stahl*, we adopted the "objective-witness test" for out-of-court statements made to a person who is not law enforcement. We explained that such a statement is testimonial for Confrontation Clause purposes if the witness would have reasonably believed that her statement would be available for use at a later trial. *Id*. The focus is on "the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." *Id*. at paragraph two of the syllabus.

{¶ 162} Delores's statements were made to a friend after Delores arrived at her home. Delores was crying and hysterical when she told Jeffries that her husband had told her that he killed the woman found in the cemetery. An objective witness would not reasonably believe that Delores's statements to her

friend while in an emotional state, repeating what her husband had told her, would be available for later use at trial. Indeed, Delores did not call the police until *after* she told Jeffries what Jones had told her.

{¶ 163} Ohio courts of appeals have reached the same conclusion in similar situations. *See State v. Zadar*, 8th Dist. No. 94698, 2011-Ohio-1060, ¶ 38 (statements to a friend and a therapist not testimonial under "objective witness" test); *State v. Peeples*, 7th Dist. No. 07 MA 212, 2009-Ohio-1198, ¶ 31 (statement to a friend not testimonial because objective witness would not reasonably believe that the statement would later be used at trial).

{¶ 164} For all of these reasons, we conclude that Delores's statements to Jeffries were not testimonial, and their admission into evidence did not violate the Confrontation Clause.

*Admissibility under Evid.R. 803(2)*

{¶ 165} Having determined that Delores's statement to Jeffries was not testimonial and therefore was not barred by the Confrontation Clause, we must also now decide whether the statement was admissible under our rules of evidence.

{¶ 166} An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). A four-part test is applied to determine the admissibility of statements as an excited utterance:

> (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

(Emphasis sic.) *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955), paragraph two of the syllabus, followed and approved in *State v. Taylor*, 66 Ohio St.3d 295, 301, 612 N.E.2d 316 (1993), fn. 2.

{¶ 167} First, Jones's confession to Delores that he killed a woman was startling enough to produce sufficient nervous excitement to prompt Delores to make the excited utterance to Jeffries. *See State v. Bealer*, 12th Dist. No. CA2002-3-056, 2003-Ohio-2114, ¶ 24 (defendant's confession and description of a murder was a startling event).

{¶ 168} Second, Delores's statements to Jeffries were made while she was still under the stress of the startling occurrence, even though they were not contemporaneous with Jones's confession.

There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the

declarant is still under the stress of the event and the statement may *not* be a result of reflective thought.

Therefore the passage of time between the statement and the event is relevant but not dispositive of the question. "[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation."

(Emphasis sic.)  *Taylor* at 303, quoting *State v. Duncan*, 53 Ohio St.2d 215, 219-220, 373 N.E.2d 1234 (1978).

{¶ 169} Less than an hour had elapsed between Jones's confession and Delores's utterance to Jeffries.  Delores went on a short walk with Jones and then drove alone to Jeffries's home during that time.  Jeffries testified that Delores was highly upset and screaming when she entered Jeffries's home.  Delores ran upstairs and blurted out that Jones had killed the woman found in the cemetery.  Thus, Delores was under the influence of the startling occurrence when she made her excited utterance to Jeffries.  *See State v. Wallace*, 37 Ohio St.3d 87, 90-91, 524 N.E.2d 466 (1988) (affirming admission of statements as excited utterances even though there was a 15-hour interval between the startling occurrence and the utterance and even though the declarant was unconscious for part of that time); *State v. Baker*, 137 Ohio App.3d 628, 649, 739 N.E.2d 819 (12th Dist.2000) (admitting testimony notwithstanding a several-hour interval between startling occurrence and utterance).

{¶ 170} Jones argues that Delores's statements were not made under the stress of the startling event because Delores responded to Jeffries's questions. However, we have held:

> [T]he admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties.

*Wallace*, paragraph two of the syllabus.

{¶ 171} Delores told Jeffries, "He did it, he did it" before Jeffries asked any questions. Jeffries questioned Delores immediately thereafter. This questioning prompted Delores to reveal that she had been speaking about her husband and the dead woman found in the cemetery. Jeffries's questions to Delores were clarifying, not leading. And they helped Delores express the focus of her thoughts. Finally, Delores responded to these questions while she was "hysterical" and highly excited. Accordingly, Delores's statements did not lose their character as "excited utterances" just because she was, in part, answering questions.

{¶ 172} Finally, the statements meet the third and fourth requirements of the *Potter* test. Because these requirements are factually inextricably intertwined, we will address them together.

{¶ 173} Delores's statements related directly to the startling event, i.e., what Jones had told her, and Delores was with Jones when he admitted killing the woman who was found at the cemetery. The rationale behind *Potter*'s fourth requirement is to ensure the reliability of a declarant's excited utterance. *Id*., 162 Ohio St. at 496-498, 124 N.E.2d 140. Delores's presence at Jones's confession provided the necessary reliability for her statements.

{¶ 174} Jones cites *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 44, and argues that Delores did not have an opportunity to

"personally observe the matters asserted in her statement or declaration," as required by the fourth prong of the *Potter* test, because Delores did not witness Jones kill Yates or see the body in the cemetery.

{¶ 175} But the startling event was Jones's confession and not the murder itself. For that reason, Jones's reliance on *Smith* is inapposite. *Smith* held that the declarant's statement "he killed my baby" did not meet *Potter*'s fourth requirement because the declarant did not witness her baby's death. *Id*. at ¶ 43-44. The facts also showed that the declarant's boyfriend, the defendant, did not tell the declarant that he had killed the baby. *Id.* at ¶ 4-5. Thus, *Smith* is distinguishable because Jones, unlike Smith, told Delores that he had killed Yates, and Delores's out-of-court statement related to that confession.

{¶ 176} For all these reasons, we conclude that Delores's statements to Jeffries qualified as excited utterances under Evid.R. 803(2) and were therefore properly admitted into evidence. But because Delores's statements to Morrison were testimonial under *Crawford* and were improperly admitted into evidence, we must determine whether the error was reversible or harmless.

*Harmless error beyond a reasonable doubt*

{¶ 177} We hold that the erroneous admission of Morrison's testimony relaying Delores's out-of-court statements was harmless beyond a reasonable doubt in view of the remaining evidence establishing Jones's guilt. "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶ 178} Properly admitted evidence establishing Jones's guilt beyond a reasonable doubt includes expert testimony that Jones's DNA was found on vaginal swabs obtained from the victim and a stain found on the inside of Yates's skirt. The police also recovered a cross from Jones's home that was similar to the

cross found over Yates's eye. Delores's excited utterance to Jeffries provided further evidence linking Jones to Yates's murder.

{¶ 179} Moreover, Jones admitted that he killed Yates when he testified on his own behalf. He claimed that her death was an accident that occurred while they were having "rough" sex. However, Dr. Sterbenz testified that Yates had been strangled for an extended period of time. He found extensive bruising on Yates's neck and face during the autopsy. Dr. Sterbenz also found vaginal injuries that may have been caused by "a fist * * * or very large rigid foreign object." A twig was also found inside the victim's rectum about four to six inches from the anal opening. Finally, T.J. testified that Jones had threatened, choked, and raped her under similar circumstances in 1990.

{¶ 180} Based on the foregoing, we overrule proposition II.

{¶ 181} *Evidence obtained from Jones's wife*. In proposition of law III, Jones argues that the admission of a plastic cross that his wife turned over to the police violated his spousal privilege.

{¶ 182} Delores told the police that she had found a plastic cross in her jewelry box that was similar to the one that the police recovered from Yates's eye. Thereafter, Delores gave her cross to the police. During the trial, the prosecutor asked Delores, "And do you recall where that cross came from? The one in your jewelry box, do you know where it came from?" Delores replied, "Phillip had gave it to me" and that Jones had given it to her in June 2006. Jones did not object to Delores's testimony on this subject; nor did he seek its suppression.

{¶ 183} Now, Jones argues that both Delores's testimony that Jones gave her the cross and the admission of the cross itself violated R.C. 2945.42, which prohibits spousal testimony about any "act done by either [spouse] in the presence of the other." Jones's failure to object waived any privilege.[11] *See Savage*, 30

---

11. In any event, the admission of the testimony and the cross did not violate Jones's spousal privilege because Jones and Delores were not married when Jones gave Delores the cross. Jones

Ohio St.3d at 3, 506 N.E.2d 196; *Ruch v. State*, 111 Ohio St. 580, 588, 146 N.E. 67 (1924). Based on the foregoing, proposition III is overruled.

{¶ 184} *"Other acts" testimony*. In proposition of law IV, Jones argues that the trial court erred in admitting evidence that Jones had attacked and raped T.J. in 1990.

{¶ 185} "Evidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. Evid.R. 404(B). "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶ 186} T.J.'s testimony was admissible to prove lack of mistake or accident. Jones told police after he was arrested, "[A]ll I'm going to say about this is that it was an accident." Thus, T.J.'s testimony was material because Jones claimed that he had accidentally killed Yates, and the testimony was therefore properly offered by the state in its case-in-chief to prove absence of accident.

{¶ 187} Jones argues that T.J.'s testimony was improperly admitted to prove identity because he "admitted to being there," and therefore, "[i]dentity was not a material issue in this case." Because absence of mistake provided an independent basis for the admission of the testimony in the state's case-in-chief, we need not address whether T.J.'s testimony could also be admitted during the state's case-in-chief to prove identity. But we do hold that, at the very least,

gave Delores the cross in June 2006, but they were not married until November 13, 2006. R.C. 2945.42 applies only to a spousal "communication made by one to the other, or act done by either in the presence of the other, *during coverture*." (Emphasis added.) Coverture has been defined as "the condition or state of a married person, whether man or woman." *Bentleyville v. Pisani*, 100 Ohio App.3d 515, 517, 654 N.E.2d 394 (8th Dist.1995). Thus, R.C. 2945.42 does not cover communications made or acts performed prior to marriage. *See Bolen v. Humes*, 94 Ohio App. 1, 6, 114 N.E.2d 281 (5th Dist.1951); 1 Gianelli, *Evidence*, Section 501.23, at 406 (3d Ed.2010).

Jones's testimony raised identity to justify the jury's ultimate consideration of T.J.'s testimony as to both identity and absence of accident.

{¶ 188} Jones testified that when he picked up Yates, "[s]he was kind of battered from the fight because [another man] was kind of dwelling on her." Accordingly, he claimed that he did not cause the injuries to Yates's face and neck. And Jones testified that "some other guy" was also likely responsible for Yates's anal and rectal injuries. The presence of these injuries was central to the state's case and Jones's denying having caused them directly implicated identity.

{¶ 189} Several common features link Yates's murder and rape and T.J.'s rape. Jones drove both women, whom he barely knew, to an isolated location. He then beat, choked, and vaginally raped them. Jones attempted to anally rape T.J.. Similarly, Jones anally raped Yates; a twig was found inside her rectum, and significant bruising was found on the outer surfaces of her anus and rectum. Although there are some factual differences, the evidence of the first rape tends to show the identity of the perpetrator of the second rape. Thus, evidence of Jones's rape of T.J. meets the requirements for admissibility to show proof of identity. *See State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 44 (defendant's prior rape admissible to show proof of identity where "[s]everal common features" linked that rape to charged offenses of rape and murder).

{¶ 190} T.J.'s testimony also helped to establish Jones's motive for murdering Yates to escape detection or apprehension. *See Craig* at ¶ 45. After being raped and released, T.J. immediately notified police that Jones had raped her; he was convicted and was then incarcerated for 14 years. *See id.* T.J.'s testimony supports the state's argument that Jones killed Yates so that she could not notify the police that he had raped her.

{¶ 191} Jones contends that T.J.'s testimony should not have been admitted because the 1990 rape and the 2007 rape-homicide were too removed in

time.  In considering whether "other acts" evidence is too remote from the offense charged, we have stated:

> [A]lthough "other acts evidence aimed at showing an idiosyncratic pattern of conduct should not be so remote from the offense charged as to render them non-probative, logic does not require that they necessarily be near the offense at issue in both place and time.  * * *  The key to the probative value of such conduct lies in its peculiar character rather than its proximity to the event at issue."

*Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 46, quoting *State v. DePina*, 21 Ohio App.3d 91, 92, 486 N.E.2d 1155 (9th Dist.1984).

{¶ 192} The 17-year separation of time, while significant, does not preclude the admissibility of T.J.'s testimony.  The two events present similar fact patterns with similar and unique features that tend to identify Jones as the person who raped and murdered Yates.  The length of time between the offenses is also less significant because Jones had been in prison for 14 of the 17 years.  Accordingly, this argument is rejected.

{¶ 193} Finally, Jones argues that T.J. should not have been allowed to testify, because her testimony ran a high risk of unfairly prejudicing the jury against him.  But the trial court provided the jury with the following limiting instruction:

> Evidence was received about the commission of other acts alleged to have been committed by the defendant in 1990 involving T.J.  That evidence was received only for a limited purpose.  It was not received, and you may not consider it, to prove the character of

the defendant in order to show that he acted in conformity with that character. If you find that the evidence of other acts is true and the defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves: One, the defendant's absence of mistake or accident, motive, intent or purpose, opportunity, preparation or plan to commit the offenses charged in this trial; or, two, the identity of the person who committed the offenses in this trial through his scheme, plan or system.

This evidence cannot be considered for any other purpose.

**{¶ 194}** "A presumption exists that the jury has followed the instructions given to it by the trial court." *State v. Murphy*, 65 Ohio St.3d 554, 584, 605 N.E.2d 884 (1992). These instructions minimized the likelihood of any undue prejudice regarding the jury's consideration of T.J.'s testimony. In view of these instructions and the probative value of T.J.'s testimony, we conclude that the trial court did not abuse its discretion in admitting T.J.'s testimony.

**{¶ 195}** Based on the foregoing, proposition IV is overruled.

### *Penalty-phase issues*

**{¶ 196}** *Prosecutorial misconduct*. In proposition of law V, Jones argues that the prosecutor committed misconduct by improperly cross-examining Joseph Dubina, a defense witness, during the penalty phase.

**{¶ 197}** Dubina, the regional administrator of the Akron Regional Adult Parole Authority, testified that Senate Bill 2 was passed in 1996 and enacted "truth in sentencing." He testified that a person sentenced to life in prison without the possibility of parole will remain in prison until he dies. Thus, he testified, if Jones receives a sentence of life without parole, he will never get out of prison. Trial counsel also asked Dubina the following questions:

Q (defense counsel): From time to time, we have heard the word commutation of sentence, or that sort of thing. You have been with the parole board twenty-six years; is that correct?

A: Parole authority, yes.

Q: And up until—as far as you know, officially, in the last 15 years, has any governor pardoned anybody or let them off death row?

A: No, none that I'm aware of in the last 15 years.

{¶ 198} During cross-examination, the prosecutor asked Dubina about the commutation of sentences:

Q: Okay. Attorney O'Brien asked you about a sentence, sentences being commuted. Tell the jury what that mean[s]?

A: The governor has the authority to commute or pardon sentences that were set forth in court. And so they have the authority to do that. And also, if there is a law, change sometime between their sentence, when it is set and when it is finished * * * can change it as well.

Q: So if somebody is sentenced to death row, they are placed on death row, the governor could commute that sentence, correct?

A: Yes.

{¶ 199} Over defense objection, the prosecutor asked Dubina about another death-row inmate:

Q: Are you aware of a defendant named Spirko, I believe out of Cuyahoga County who had been on death row and his sentence just today was commuted, just in the paper today, commuted by the governor?

A: I have not officially heard or seen that. I know there was hot media attention and a lot of issues there, but I have not—

Q: That wouldn't surprise you that happened today?

A: No. He has the authority to do that.

{¶ 200} The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 201} Jones argues that the prosecutor's questions about Spirko's commutation were irrelevant and improper. Evid.R. 611(B) provides, "Cross-examination shall be permitted on all relevant matters and matters affecting credibility." Moreover, "[t]he limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre*, 6 Ohio St.3d 140, 145, 451 N.E.2d 802 (1983).

{¶ 202} The prosecutor committed no misconduct in asking about the Spirko commutation, because the defense opened the door to this line of cross-examination when Dubina testified that the governor has not pardoned anyone on death row in the last 15 years. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 318. Nevertheless, Jones claims that such cross-

examination effectively eliminated any sentencing option other than death from the jury's consideration, because the jurors were left with the impression that his sentence could be commuted at some point in time. We reject this argument because it is wholly speculative, at best. Proposition V is overruled.

{¶ 203} In proposition of law VII, Jones argues that the prosecutor committed misconduct during its penalty-phase opening statement in stating:

> What has been determined in the state of Ohio, as in some other states throughout the country, is that a citizen should not have to worry about walking down the street and being raped and murdered, and in this case, I would say specifically Susan Yates. That is why this case has such significance, because it was in connection, this aggravated murder was in connection with this rape.

{¶ 204} Jones argues that the prosecutor's remarks improperly appealed to the fears and passions of the jury by telling them that the death penalty was appropriate because citizens should be free to walk the streets and not worry about being raped and murdered. But Jones failed to object to these remarks and thus waived all but plain error. *See State v. Wade*, 53 Ohio St.2d 182, 373 N.E.2d 1244 (1978), paragraph one of the syllabus. No plain error occurred.

{¶ 205} "During opening statements, counsel is accorded latitude and allowed 'fair comment' on the facts to be presented at trial." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 145, quoting *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. The prosecutor's comments portrayed what happened to Yates on the day she was raped and murdered. The prosecutor's remarks were not overly emotional and represented fair comment. Moreover, the trial court instructed the jury that "[t]he

opening statements * * * of counsel are designed to assist you. They are not evidence." It is presumed that the jury followed the instructions of the judge. *Diar* at ¶ 145.

{¶ 206} Based on the foregoing, we reject proposition VII.

{¶ 207} *Proportionality review*. In proposition of law IX, Jones argues that Ohio's proportionality review is unconstitutional. He contends that a meaningful proportionality review must include cases resulting in life imprisonment after a capital-sentencing hearing, as well as those resulting in the imposition of the death penalty. However, we have consistently held that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of cases in which the death penalty has been imposed. *See State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 51; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph one of the syllabus. Proposition IX is overruled.

{¶ 208} *Constitutionality*. In proposition of law X, Jones challenges the constitutionality of Ohio's death-penalty statutes. These claims can be summarily rejected. *See State v. Carter*, 89 Ohio St.3d 593, 607, 734 N.E.2d 345 (2000); *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph one of the syllabus.

{¶ 209} In addition, Jones claims that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. These arguments lack merit. *See State v. Issa*, 93 Ohio St.3d 49, 69, 752 N.E.2d 904 (2001); *State v. Phillips*, 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643 (1995).

{¶ 210} Jones also challenges the constitutionality of lethal injection. We have previously rejected similar claims. *See State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 131; *Carter* at 608.

{¶ 211} *Appropriateness of death sentence*. In proposition of law VIII, Jones argues that the death penalty is not appropriate, because of the compelling mitigating evidence presented in his behalf. We reject this argument for the reasons we explain during our independent sentence evaluation.

## INDEPENDENT SENTENCE EVALUATION

{¶ 212} Having considered Jones's propositions of law, we must now independently review Jones's death sentence for appropriateness and proportionality as R.C. 2929.05(A) requires.

{¶ 213} *Aggravating circumstance*. The evidence at trial established beyond a reasonab**l**e doubt that Jones murdered Susan Yates while committing or attempting to commit rape, R.C. 2929.04(A)(7).

{¶ 214} The dissent argues that there is residual doubt that Jones murdered Yates while committing rape.

{¶ 215} During his testimony, Jones claimed that he did not intentionally murder Yates and, in so claiming, spun a tale of consensual sex gone awry. Initially, the dissent asserts that Yates's death was, as Jones claimed, "possibly accidental." Dissenting opinion at ¶ 270. Eventually though, it concedes that "the jury could easily conclude, beyond a reasonable doubt, that Phillip Jones murdered Susan Yates * * *." Dissenting opinion at ¶ 283. In its final analysis, the dissent is unequivocal: "There was no accident." Dissenting opinion at ¶ 283.

{¶ 216} But the dissent takes the bait on Jones's claim of consensual sex and questions, "But was there a rape?" Dissenting opinion at ¶ 284.

{¶ 217} Tellingly, the dissent uses its next sentences to describe Yates's poverty and substance abuse. And it wonders, "[A]t some point did she draw her knife demanding more crack or his cash?" Dissenting opinion at ¶ 285. The innuendo is inescapable and offensive. Moreover, it was precisely Yates's station in life—including that she was homeless and penniless—that Jones preyed on. In our view, that makes the death penalty more appropriate, not less.

{¶ 218} In any event, Yates's body was the best evidence that Jones raped her. And it was the best evidence that he killed her while she resisted the rape. Jones's DNA was found in Yates's badly bruised and torn vagina, which had also suffered injuries that were caused by a fist or "very large rigid foreign object." Yates suffered similar injuries to her anus and rectum. Moreover, the back of Yates's head had suffered a pounding action from being slammed to the ground repeatedly. She clawed at her own neck trying to free her airway while Jones vigorously and relentlessly strangled her.

{¶ 219} Yates's body told the story of the unmitigated and gruesome events that took place in the graveyard that night. Her body screamed the terror that Yates suffered: "I was killed while resisting rape." Jones silenced Yates's voice; the dissent seeks to silence her body.

{¶ 220} At trial, medical and forensic experts gave appropriate voice to Yates's body. Hemmed in by the overwhelming medical and forensic evidence, the dissent advances a completely unfounded theory: Jones abused Yates's corpse. In doing so, it questions whether the medical examiner could actually tell whether Yates's injuries were postmortem, ignoring relevant testimony of the medical examiner on that very subject. Bruising manifests differently before death than after because after death, "there is no more body reaction."

{¶ 221} And the dissent's wild speculation contradicts (of all things) Jones's testimony itself.

{¶ 222} Recall that Jones's defense was that the killing was accidental and the intercourse was consensual. On that point, Jones unequivocally testified that he killed Yates while he was having vaginal intercourse with her. And lest we forget, Jones claimed that his demonstration of the strangulation was unfairly prejudicial because the strangulation and the intercourse were inextricably intertwined, having occurred simultaneously.

{¶ 223} But the dissent would justify setting aside Jones's death penalty by dismissing the very argument that Jones has consistently advanced throughout this litigation. To get there, the dissent would conveniently dismiss the inconvenient portions of Jones's testimony by declaring that "at best [Jones's testimony] could be only partially true." Dissenting opinion at ¶ 286. This statement is emblematic of the fundamental problem with the dissent's reasoning—that is, it invents "facts" and ignores facts and therefore materially alters the questions before us. And it refuses to apply settled law—which brings us to the bottom line: residual doubt is not a mitigating factor. *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus. Even if it were, there is none here.

{¶ 224} *Mitigating evidence*. Against this aggravating circumstance, we are called upon to weigh the mitigating factors contained in R.C. 2929.04(B). Jones called ten mitigating witnesses and made an unsworn statement. The defense also presented other documentary evidence and family photographs.

{¶ 225} Dr. James Siddall, a clinical and forensic psychologist, evaluated and conducted psychological testing of Jones. Dr. Siddall reviewed Jones's educational, criminal-justice, and mental-health records and submitted a written report. He noted that Jones had been incarcerated most of his life.

{¶ 226} Jones was born May 2, 1970, and was raised in Akron. Dr. Siddall testified that Jones grew up in a troubled family where there was domestic violence, and his parents divorced when Jones was young.

{¶ 227} Dr. Siddall testified that Jones's family has a history of psychiatric, substance-abuse, and criminal-justice problems. Dr. Siddall stated that these problems have moved across the generations and began with Jones's paternal and maternal grandparents. His paternal grandfather was an alcoholic, engaged in domestic abuse, and died of a fatal injection of poisoned heroin. Jones's maternal grandmother suffered from some form of mental instability and

alcohol use. She was sent to prison for murdering her boyfriend, who had raped and killed one of her sons. Jones's father committed domestic abuse and suffered from a learning disability. His mother moved through foster care as a child and developed alcohol-related problems.

{¶ 228} Jones attended special-education classes in the Akron public schools and did not adjust well to school. He was retained in a couple of grades and was moved between schools several times. Jones was expelled in the tenth grade because of truancy, disruptive behavior, and failing grades.

{¶ 229} Jones was incarcerated several times as a juvenile. Between 1979 and 1988, Jones was convicted of receiving stolen property, destruction of property, and criminal damaging related to a series of auto thefts. Jones was also convicted of petty theft and disorderly conduct. Jones was depressed and made several suicide attempts during adolescence. He attempted to hang himself when he was 16 and took an overdose of pills when he was 17.

{¶ 230} As an adult in 1989, Jones was convicted of receiving stolen property and violating probation. In 1990, he was convicted of two counts of attempted rape and served 14 years in prison. Dr. Siddall testified that Jones had significant psychiatric interventions in prison. His mood and behavior were very unstable, and he tried to cut himself on numerous occasions. In 2004, Jones was paroled and was classified as a sexually oriented offender.

{¶ 231} Jones used alcohol and marijuana during his youth. Jones resumed using alcohol after he was paroled in 2004, but denied abusing drugs.

{¶ 232} Jones and Delores married in November 2006. Jones is also the father of a teenage son and daughter, who were born during his relationship with a former girlfriend.

{¶ 233} Dr. Siddall testified that Jones's reading ability is at the eighth-grade level. Results of the Wechsler Abbreviated Scale of Intelligence test indicated that Jones has a full-scale IQ of 86, which places him in the low-average

range. Results of the Brief Neuropsychological Cognitive Examination ("BNCE") were in the normal range, with the exception of one subset. Excluding this subset, the BNCE results showed no evidence of neurocognitive impairment. Dr. Siddall reported that Jones's "cognitive functioning including attention, concentration, recent and remote memory and problem solving were intact."

{¶ 234} Jones's scores on the Structured Inventory of Malingered Symptomatology ("SIMS") were "significantly elevated" and indicated "a level of distortion and exaggeration." Test results on the Minnesota Multiphasic Personality Inventory-2 and the Personality Assessment Inventory showed the same level of distortion. According to Dr. Siddall, the distortion of these scores indicates that Jones may have been attempting to draw attention to his situation or seeking to derive the secondary benefit of talking to mental-health professionals and to possibly receive medication.

{¶ 235} Dr. Siddall diagnosed Jones with a mood disorder resulting from a "serious history of depression and mood instability * * * [that] is associated with repeated suicidal behaviors, gestures, [and] attempts." Jones was also diagnosed with a history of alcohol and cannabis abuse and an antisocial-personality disorder. Jones has also demonstrated psychotic behavior and has reported hallucinations.

{¶ 236} In summary, Dr. Siddall testified that Jones has "a chronic history of mental illness which has required very expansive psychiatric treatment while he was incarcerated and in the community." Jones has been repeatedly hospitalized and been treated with antidepressants, mood-stabilizing drugs, and antipsychotic medications. Jones was also raised in a family with a long history of psychiatric problems, alcohol and drug abuse, domestic violence, and involvement with the criminal-justice system. Dr. Siddall testified that these severe problems affect most members of Jones's family and represent "a rather unusual cluster of very serious problems in a given family." He opined that

"certain psychiatric problems, certain psychological problems * * * are known to be biologically based * * * [and were] genetically transmitted * * * across generations in the Jones family."

{¶ 237} During cross-examination, Dr. Siddall acknowledged that a Dr. Stafford, a psychiatrist who treated Jones at the Oakwood Forensic Hospital, reported that Jones admitted that he falsely reported hearing voices. Dr. Stafford concluded, "He is not psychotic at all. His whole outlook is due to malingering and put on." Dr. Stafford's report also stated that Jones "puts on psychosis due to experience with mental health professionals through the years. He is difficult to differentiate because he is clever to answer vaguely."

{¶ 238} Henrietta Jones, the defendant's mother, testified that the defendant is the youngest of her eight children. Henrietta stated that all her children had problems with the law and substance abuse. Henrietta married Jones's father in 1959, divorced him in 1978, and remarried him in 1998.

{¶ 239} Jones was born with "lazy eye." His siblings and the neighborhood kids taunted and teased him because of it. Jones received corrective surgery when he was 12 years old. Jones was a slow learner in school and was held back in the first and third grades. Jones had mental-health problems at a young age. He drank gasoline when he was eight years old and had to have his stomach pumped. Jones later tried to hang himself and was admitted for treatment at the Mansfield Psychiatric Hospital.

{¶ 240} Henrietta testified that Jones's father worked at the post office for 37 years. Henrietta worked at the post office also and held a variety of other jobs. Henrietta stated that she provided a stable home for her children and provided for their needs. Jones was involved in church as a child and attended Sunday school. Henrietta has a very close relationship with Jones and stated, "He was very concerned when I get sick. He was always there for me to take me to the doctor and things like that." Jones also had a close relationship with his father.

{¶ 241} Yolanda White, Jones's oldest sister, testified that Jones was teased and picked on when he was young because of the lazy eye. Jones told White that the teasing made him feel unwanted and unloved. Jones acted out on his feelings of inadequacy by attempting suicide on a couple of occasions. White remembers that Jones said that he was hearing voices around this time. Jones also did poorly in school and repeated two grades. White does not believe that Jones received the help that he needed to do well in school. White also testified that all her siblings have criminal records, as does she. White has felony convictions for possession of crack cocaine and theft and misdemeanor convictions for misrepresentation.

{¶ 242} Christy Harmel and Jones developed a relationship when they were both 18 years old. They have two children, Melany Harmel and Phillip Jones Jr. Before Melany's birth and when Phillip Jr. was an infant, Jones was sent to prison for 14 years. Christy took the children to visit Jones while he was in prison. Jones also wrote to his children while he was in prison and provided them with money that he made working there. Christy testified that Jones continues to touch the lives of his children by counseling them and providing them with positive attitudes.

{¶ 243} Melany Harmel, who was 16 years old at the time of the trial, visited her father after he went to prison in 1990. They exchanged letters and photographs, and she received gifts from him at Christmas. When he was released from prison in 2004, Jones visited her every day. Jones has provided her with fatherly advice about staying away from drugs and avoiding problems with boys. Melany stated that she would continue to see Jones if he is sent to prison for the current offenses. She expressed her love for Jones and said, "He is a wonderful person."

{¶ 244} Phillip Jones Jr., 17 years old at the time of the trial, remembered visiting Jones in prison on a couple of occasions and talking to him on the phone

numerous times. After Jones's release from prison, Phillip saw Jones almost every day, and they developed a good relationship. Phillip dropped out of school in the ninth grade, but his father has encouraged him to stay in school and not do "stupid stuff." Phillip loves his father and will continue to be there for him.

{¶ 245} Joseph Dubina, the regional administrator of the Akron Regional Adult Parole Authority, testified that Senate Bill 2, passed in 1996, imposed "truth in sentencing." Therefore, he testified, a person sentenced to life in prison without the possibility of parole will remain in prison until he dies. Dubina stated that if Jones were sentenced to life in prison without parole eligibility for 30 years, he would not meet a parole board until 2038, when he would be 67 years old. Similarly, if Jones were sentenced to life in prison without parole eligibility for 25 years, he would not meet a parole board sooner.

{¶ 246} J.C. Patterson, a pastor and an employment specialist for an ex-offender program, met Jones in 2006. Patterson and Jones became best friends and studied the Bible together. Patterson was impressed with Jones's consistency and motivation. He says that Jones is a "good person."

{¶ 247} David Hargrove, the pastor of the Church of God in Akron, met Jones at a church service. Jones asked for prayer because he was troubled. Jones later said that their prayers helped him experience relief. Jones attended Hargrove's church on a regular basis for about a year, and then his attendance became sporadic. Hargrove testified that Jones is a "good guy" and should not receive the death penalty.

{¶ 248} Larry Bradshaw, the pastor of the People's Baptist Church in Akron, met Jones at a church service in 2004. Jones became a member of the church and attended services regularly. He noted that Jones has the credentials of a clergyman. Bradshaw visited Jones after learning that he was in the county jail. When they would meet, Bradshaw and Jones spent most of their time discussing

scripture. On some occasions, Jones ministered to Bradshaw and provided him with encouragement.

{¶ 249} In an unsworn statement, Jones stated that he had an abusive childhood. He witnessed domestic violence on numerous occasions, and his family abused alcohol and drugs. Jones also watched his siblings fight. His oldest brother stole cars and gave Jones marijuana when he was seven years old. Jones's parents divorced when he was eight. His mother left home, and Jones was then raised by his aunt, his grandmother, and his father. Jones tried to kill himself by drinking gasoline when he was eight years old. Jones was born with a lazy eye. He had corrective surgery, but he still has problems with his eyesight. Jones also had a learning disability that was not identified until he was in the sixth grade.

{¶ 250} After witnessing the abuse in his family, Jones started "acting out" as a teenager. Jones spent about three years in juvenile facilities. He tried to hang himself and was sent to the Mansfield Psychiatric Hospital.

{¶ 251} Jones spent almost 15 years in prison as an adult and described this experience as "hell." Jones received 69 tickets for infractions during one year in prison. He committed assaults, flooded the cells, and disrespected staff members. In August 1998, Jones was stabbed in the neck during a feud with members of the Aryan Brotherhood and almost died. Thereafter, Jones changed his behavior, and his security status in the prisons improved. Jones tried to help other inmates with a negative attitude and prevent them from making the same mistakes that he did. He also received credentials as a minister in the Universal Church in Modesto, California.

{¶ 252} In 2004, Jones was paroled. He had a difficult time finding employment because of his criminal record and was on unemployment when he raped and murdered Yates. Yet Jones worked after leaving prison and was employed by JR Wheel for almost a year.

66

{¶ 253} Jones discussed his feelings about the present charges and Yates's death:

> I can't change what I did.  I wish I could.  I live with it on my mind every day, my right hand in God above.  I can't bring back Susan.  I wish I could.
>
> I know it * * * was a bad thing.  I'm sorry for what I did, and I pray for her family and her children, and really, it is out of my hands now.  I did—you found me guilty, I'm convicted of it, and I am deeply sorry for my actions.
>
> All I can do is try to continue to just keep on helping folks, like I helped my sister get off drugs, my mom when she became elderly.

{¶ 254} Jones said he helped his father before he died and his mother-in-law who is in a nursing home.  Jones also mentioned that he still loves his wife although he no longer has any communication with her.

{¶ 255} Jones then made some final comments about his conviction:

> And, lastly, I would like to say that I am sorry for what I did to Susan, and I pray for her family and her children, and I pray to God to give them the strength to get through this, and I hope that they could forgive me in time for what I did but maybe they won't.
>
> But I don't have any harm against them even if they don't. I'm sorry for what I did.  And I did help my sister, restore her life. And I found out a couple weeks ago that my sister even prayed for Susan's sister out there in the hall.  And I—that made me kind of

really happy because it was a positive "seed" I "planted." I'm just glad it worked out like that. That's all I have to say.

{¶ 256} Before sentencing, Jones made the following statement in allocution:

Your Honor, * * * this is not a murder case, I never planned to murder Susan * * *. It was an accident which I told my wife and others from the beginning. I could not, nor would not do anything so heinous to another human being. * * * [T]he fact yet remains that a life has been taken. Unfortunately, I'm responsible for that.

However, I am not responsible for anything else, nor shall I take responsibility for * * * another's actions, such as beating Susan, raping her and aggravated murder.

* * *

To the family of Ms. Susan Yates, I'm sorry for your loss. * * * I trust that God will do something positive for both families, Christian Yates and Jones family.

### Sentence evaluation

{¶ 257} We find nothing mitigating in the nature and circumstances of the offense. Jones raped, battered, and murdered Susan Yates in an Akron cemetery and fled the scene. These facts establish a horrific crime that lacks any mitigating features.

{¶ 258} Although Jones's character offers nothing in mitigation, we give some weight to Jones's history and background. Jones grew up in a troubled family where his parents fought and argued frequently. Jones was also raised in a

family with a history of mental-health problems, alcohol and drug abuse, and involvement with the criminal justice system. Jones has a chronic history of mental illness, which required psychiatric treatment. In addition, Jones had a difficult childhood. He was taunted and teased as a child because he had a lazy eye. Jones had difficulty in school. Jones was also involved in the criminal-justice system at an early age and has spent most of his life incarcerated.

{¶ 259} The statutory mitigating factors under R.C. 2929.04 include (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender—Jones was 36 at the time of the offense), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors). Review of the evidence shows that (B)(1), (B)(2), (B)(4), (B)(5), and (B)(6) do not apply.

{¶ 260} The R.C. 2929.04(B)(3) mitigating factor is also not applicable. (B)(3) applies when "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." No evidence was presented that Jones qualified for the (B)(3) factor.

{¶ 261} But we give some weight to Jones's history of mental problems and his low-average intelligence as "other" mitigating factors under R.C. 2929.04(B)(7). Jones has a long family history of mental problems. Jones was diagnosed with a mood disorder resulting from depression. Although we note the evidence that Jones demonstrated psychotic behavior and reported hallucinations, we also acknowledge other evidence indicating that Jones falsely reported that he was hearing voices and may be malingering.

{¶ 262} We also give weight as a (B)(7) factor to testimony that Jones had a troubled childhood. *But see State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 265 (decisive weight seldom given to defendants with

unstable childhoods). We also give some weight to his history of substance abuse. Jones was diagnosed with a history of alcohol and cannabis abuse. But there is no evidence that drugs and alcohol significantly reduced his ability to control his actions on the night of the rape and murder.

{¶ 263} In addition, we give weight as a (B)(7) factor to testimony that Jones shares love and support with family members and has provided care to his children. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 338.

{¶ 264} Jones expressed remorse for Yates's death in his unsworn statement. But during allocution, Jones denied responsibility for beating, raping, and murdering Yates. Jones's denials negate any mitigating weight that we might otherwise give for his expressions of sorrow. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 205.

{¶ 265} Upon our independent weighing, we find that the aggravating circumstance clearly outweighs any mitigating factors beyond a reasonable doubt. Jones murdered Yates while raping her, a grave aggravating circumstance. The mitigating evidence pales in comparison. Therefore, we hold that the death penalty is appropriate.

{¶ 266} We also find that the death sentence imposed in this case is not "excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). The penalty is proportionate when compared to death sentences approved in other rape-murder cases under R.C. 2929.04(A)(7). *See Carter*, 89 Ohio St.3d at 611, 734 N.E.2d 345; *State v. Mason*, 82 Ohio St.3d 144, 170-171, 694 N.E.2d 932 (1998); and *State v. McGuire*, 80 Ohio St.3d 390, 404, 686 N.E.2d 1112 (1997).

## Conclusion

{¶ 267} We affirm Jones's convictions and sentence of death.

Judgment affirmed.

LUNDBERG STRATTON, O'DONNELL, CUPP, and MCGEE BROWN, JJ., concur.

LANZINGER, J., concurs in judgment only.

PFEIFER, J., dissents.

_____

**PFEIFER, J., dissenting.**

{¶ 268} I would reverse Jones's convictions and order a new trial. Every criminal defendant is entitled to a fair trial. It is one of the most basic tenets of our society and our constitutional history. Jones did not get one. He is not entitled to a perfect trial, just a fair one. It matters not how sordid are the details of the crime; nor should it matter that by taking the stand, Jones probably undermined his own defense by weaving a tale that at best could be only partially true.

{¶ 269} The majority's upholding Jones's convictions is basically a lengthy and convoluted justification for intentional and needless error injected into the trial of Jones by the prosecutor and allowed by the trial judge. It is one thing for this court to determine that the aggressive conduct of the prosecutor led to harmless error. It is quite another matter when we open the door for continued pushing at the edges of the Rules of Evidence, statutory privilege, and constitutional duties by excusing, rather than rejecting, introduction of evidence that crosses the line.

{¶ 270} What exactly was the state's theory of the actual events on the night of April 22, 2007, that led to the death of Susan Yates and the conviction of Phillip Jones for aggravated murder with a death-penalty specification? One assumes the state had an operative and successful theory of its case, but it is not revealed in the majority opinion. Rather, we are left with the details of the condition of Yates's dead body and a portion of Jones's explanation of what

occurred, consensual sex, followed by rough or erotic asphyxiation and the possibly accidental death of Susan Yates.

*Fair-trial Issues*

{¶ 271} The prosecution's use of a life-sized doll representing Susan Yates provided imaginative courtroom drama. The transcript suggests that Jones was required to step down from the witness stand, lie on the doll, and demonstrate for the jury how he choked Yates while having vaginal intercourse with her. Having been allowed by the judge, over objection, to conduct this eye-popping demonstration, the prosecutor wasn't finished. The prosecutor recalled Dr. George Sterbenz, the medical examiner, and then lay down on the doll, demonstrating Jones's testimony for the doctor. That still wasn't enough. Dr. Sterbenz left the witness stand, straddled the doll with his hands around the doll's neck, and asked the prosecutor whether he had properly understood Jones's testimony. Was this thrice-enacted demonstration prejudicial to the defendant Jones? Not according to the majority.

{¶ 272} It is at this point in the fair-trial inquiry that the prosecution's entire case comes into play. Dr. Sterbenz, the medical examiner who conducted the autopsy of Susan Yates, concluded that she died from asphyxia by strangulation. It was apparently always the view of Dr. Sterbenz that it would be impossible to cause Yates's throat injuries as a side effect of choking her. Dr. Sterbenz postulated that the injuries to Yates's neck and throat could have been caused only by a violent skin-on-skin action, presumably from a head lock or the use of a ligature involving cloth tightened by twisting it with some object. He did not use the doll to demonstrate either theory. Thus the demonstration on the doll forced on Jones by the state and then again staged by the prosecutor and by Dr. Sterbenz's during rebuttal served no purpose other than to inflame the jury. It was not probative of anything.

*R.C. 2945.42 Spousal Privilege and Excited Utterance*

{¶ 273} In its merit brief, the state refers to the concept of spousal privilege as "a relic of the common law." With that attitude in mind, the prosecutor sought to ignore R.C. 2945.42, which could have prohibited Jones's wife, Delores, from testifying about anything Jones had told her regarding the Yates matter. As part of the state's case, Delores testified that the day Susan Yates's body was discovered, she and her husband had a discussion about something that was on the news. She then testified that an hour or so later, she drove to the home of her friend Charletta Jeffries and, in an excited state, told Jeffries everything her husband had told her after the news program. She further testified that after she unburdened herself by telling Charletta about the conversation she had had with her husband, she then called the police and asked to speak to someone in charge about the dead woman in the cemetery. Finally, Delores, describing herself as still upset, had told Detective Richard Morrison details that Jones had told her. At this point, Delores left the stand, and the jurors were left on the edges of their respective seats.

{¶ 274} It is also at this point in the narrative that the majority offers the following apparently tongue-in-cheek observation: "Delores was not asked—and did not testify—as to the communication between her and Jones. Therefore, Delores's testimony did not violate Jones's spousal privilege." What next follows are several leaps of faith that not even The Flying Wallendas would attempt.

{¶ 275} First, the majority attempts to justify the wrongly decided *State v. Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, by discussing a Michigan case and a 116-year-old court of appeals case involving a letter written to his first wife by a defendant who was convicted of bigamy. After this intriguing bit of history, the majority abruptly concludes that based on *Perez*, "R.C. 2945.42 is wholly inapplicable." Majority opinion at ¶ 130. The takeaway? Delores can completely destroy the statutory spousal privilege of the

defendant, her husband Phillip Jones, simply by telling someone, anyone really, about what he had told her.

{¶ 276} Returning to the trial, the jury did not have to wait long to hear the rest of the salacious story. Charletta Jeffries quickly informed the jury that Delores had come to her home and confided that her husband had told her that he had murdered a woman named Susan, who had been found in the cemetery. Soon thereafter, the prosecution put Detective Morrison on the stand to repeat Delores's account of the putative privileged conversation between herself and the defendant regarding Yates's death.

{¶ 277} The Confrontation Clause of the Sixth Amendment to the United States Constitution must be addressed before the court can condone the hearsay testimony of Jeffries and Morrison about defendant Jones's conversation with his wife. The majority correctly determines that Delores is unavailable for purposes of the Confrontation Clause because Jones invoked the spousal privilege. It further correctly determines that Delores's statements to Morrison were testimonial and that their admission into evidence violated the Confrontation Clause. I disagree with the majority's conclusion that the admission was harmless error.

{¶ 278} The next leap is awesome. The majority examines Delores's disclosures to Jeffries and determines that Delores "would not reasonably believe that [her] statements to her friend * * * would be available for later use at trial." Majority opinion at ¶ 162. Never mind that Delores had immediately thereafter summoned the police detective to Jeffries's home using Jeffries's phone. Ignore the fact that Delores repeated the story to Detective Morrison in Jeffries's home in the presence of Jeffries. Does the majority actually believe that Delores Jones told Charletta Jeffries that her husband told her that he "killed that girl in the cemetery," expecting such news to remain their little secret without police or court involvement? No, the majority deftly concludes: "Delores's statements to

Jeffries were not testimonial, and their admission into evidence did not violate the Confrontation Clause." Majority opinion at ¶ 164.

{¶ 279} Just one more leap. Hearsay. Well, not quite. More like hearsay about hearsay. Evid.R. 802 prohibits hearsay testimony. Evid.R. 803 defines specific exceptions, including the excited-utterance exception found in Evid.R. 802(2): "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Did Delores observe an event or condition? No. What she reported to Jeffries was information that her husband had told her during what should be a statutorily privileged communication. When Delores reported the conversation to Jeffries, Phillip Jones's words were hearsay. When Jeffries testified, Jones's words became double hearsay. Finally, to determine that Jeffries's testimony was allowable, the majority concludes that the circumstances of the death of Susan Yates were not the startling event; rather, the startling event was hearing Jones's statements. Hence, Delores's confession about a confession is magically transformed from a privileged spousal conversation into an excited-utterance exception to the hearsay rule. That's pretty neat legal prestidigitation.

*Other-acts Testimony*

{¶ 280} During the trial, the state was allowed to present T.J. to testify that Jones had raped her in 1990, when Jones was about 20 years old. The state was also allowed to introduce T.J.'s hospital records made at the time of the attempted rape. T.J.'s testimony was, of course, highly prejudicial to the defendant and is prohibited by Evid.R. 404 (B) (prohibiting evidence of other crimes). The state argues, and the majority agrees, that T.J.'s testimony was a proper exception relating to proof of identity and proof of the absence of accident.

{¶ 281} Proof of identity is a straw man. Jones readily admitted that he caused the death of Susan Yates. Proof of absence of mistake or accident has little rational connection to Jones's 17-year-old attempted rape of T.J. Jones

claimed that he caused Yates's death by accidently applying too much choking pressure on her throat while performing consensual erotic asphyxiation during vaginal intercourse with Yates. The best and only evidence that Yates's death was not accidental came from Dr. Sterbenz. Jones's conviction for attempted rape was far more remote in time than this court has ever allowed as an Evid.R. 404(B) exception. It informed the jury only that Jones had attempted to rape T.J. and that he had choked her with his hands, not with a ligature or head lock, 17 years earlier. The conclusion that the prosecutor tendered T.J.'s testimony for the purpose of proving Jones's bad character and criminal propensity is inescapable and violates Evid.R. 404(B). Furthermore, the majority states that Jones vaginally raped T.J. even though Jones was convicted of attempted rape.

*Residual Doubt and Proof Beyond a Reasonable Doubt*

{¶ 282} Assisted by the fair-trial infractions outlined herein, the jury convicted Jones on all counts and recommended that he be sentenced to death. Were they correct? What actually occurred in the cemetery on April 22, 2007? Jones claimed that he and Susan Yates acquired some crack cocaine and beer and went to the cemetery, sat on a blanket, and eventually engaged in the consensual vaginal intercourse that escalated at the request of Yates into rough and erotic asphyxia sex. According to Jones, that activity accidently led to Yates's death when he applied too much choking pressure. Jones denied that he had any part in the vaginal and rectal damage to Susan Yates that was revealed by Dr. Sterbenz's autopsy.

{¶ 283} Given the unrebutted testimony of Dr. Sterbenz regarding the cause of death and Jones's confession, plus the testimony of Jeffries and Detective Morrison that Jones had admitted to his wife, Delores, that he had killed Susan, the jury could easily conclude, beyond a reasonable doubt, that Phillip Jones murdered Susan Yates on the night of April 22, 2007. There was no accident.

**{¶ 284}** But was there a rape? Jones testified he had known Yates for some time, had taken her to his home to shower when his wife was not there, and had given her money for food in the past. He testified that on the evening in question, they had acquired crack cocaine and beer, had driven to the cemetery, had spread out a blanket, and had had a good time until she died. Yates had alcohol and cocaine in her system at her death. Because there was no evidence of a struggle in Jones's automobile, this part of his testimony is plausible. What happened next was tragic for Susan Yates. It would not be reasonable to assume that any person besides Jones was involved, but the order of events is critical.

**{¶ 285}** At some point, Jones killed Yates. Because Jones's testimony on this subject is not credible, what set him off is unknown. Was that his plan from the beginning? Nothing in his past indicates a propensity for murder. Was the rough sex his idea, not hers, and did it turn to rape, then abuse, then murder to escape detection? Or at some point did she draw her knife demanding more crack or his cash? Did a fight ensue, then murder, then, in a rage, abuse of Yates's corpse? Was it possible for the medical examiner to determine whether the gross injuries to her vagina and rectum were postmortem? If Jones had consensual sex with Yates, then murdered her, and then in a rage abused her body, there would be no death-eligible specification.

**{¶ 286}** This dilemma, this lack of certainty about critical events in the unfolding of the crime, is residual doubt. It is not often present in death-penalty cases. In *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus, we rejected residual doubt as a reason to overturn a death sentence, a statement of the law in which I did not concur. *Id*. at 405-406 (Pfeifer, J., concurring in judgment only). These many years later, this is the first case in which I would find that residual doubt should result in overturning a death sentence.

*Conclusion*

*What Should Happen Now?*

**{¶ 287}** With the exception of death-penalty cases, this court views the criminal-justice system from 30,000 feet. Out of the tens of thousands of serious criminal cases that Ohio judges and prosecutors handle each year, we review only a few. It is our responsibility to ensure fairness by requiring judges to enforce the rules, statutes, and constitutional protections afforded every citizen accused of a crime. As we exercise oversight of this system through case review, there has been a singular constant in our direction to trial judges, prosecutors, and defense counsel: Do it right or do it over.

**{¶ 288}** Jones did not get a fair trial. It should be a do-over, without the doll, without any testimony about the privileged spousal conversations, and, most assuredly, without the prior-acts testimony. To affirm will embolden prosecutors to increasingly follow an aggressively edgy path to ensure convictions and to encourage judges to be accommodative with little fear of reversal.

**{¶ 289}** I dissent.

_____

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Heaven DiMartino, Assistant Prosecuting Attorney, for appellee.

Nathan A. Ray and Lawrence J. Whitney, for appellant.

_____